IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JASON GOODMAN | Case No.: 1:21-cv-10878-AT-JLC |
| Plaintiff, | |
| vs. | **REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S OBJECTION TO ORDER AND REPORT AND RECOMMENDATION** |
| CHRISTOPHER ELLIS BOUZY, BOT SENTINEL, INC, GEORGE WEBB SWEIGERT, DAVID GEORGE SWEIGERT, BENJAMIN WITTES, NINA JANKOWICZ, ADAM SHARP, MARGARET ESQUENET, THE ACADEMY OF TELEVISION ARTS AND SCIENCES, SETH BERLIN, MAXWELL MISHKIN, | |
| Defendants | |

Plaintiff Jason Goodman, by and for himself pro se, respectfully submits this reply to

Defendants' opposition to the objection to the order and report and recommendation.

## INTRODUCTION

Defendants base their opposition response on a false conclusion in which they stated,

*"Plaintiff's sprawling Objections do not identify a single factual or legal error in Judge Cott's*

*Report and Recommendation."* This is false, Goodman objected to Judge Cott's inarguably and

fundamentally false conclusion that Goodman has accused defendant Benjamin Wittes

("Wittes") of committing murder. Even in his follow up order (ECF No. 227) Judge Cott did not

deny this false conclusion. Instead he reiterated, *"Goodman argues that I falsely stated that he*

*accused defendant Wittes of murder. The Court's construction of the amended complaint led it to*

*characterize the allegations in that fashion."* Judge Cott's conclusion in this instance violates the

REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S OBJECTION TO ORDER
AND REPORT AND RECOMMENDATION - 1

principle of liberal construction of pro se pleadings.  It does the opposite in fact, construing liberally in favor of the represented Defendants.  It is a gross and clear error that indicates Judge Cott fundamentally misunderstands the basic facts of this case or else is otherwise deliberately ignoring and contradicting the facts to favor Defendants.

Goodman never made the accusation that Wittes committed murder.  Wittes has not attempted to defend the claim that Goodman accused him of murder.  The lack of specific defense to that allegation is strong evidence that even interested parties agree Goodman did not make that claim.  The fundament basis of this case is Goodman's claim that Wittes participated in a conspiracy to conceal information about the death of political operative Peter W. Smith ("Smith").  This claim was the basis for the initial contact between Goodman and Christopher Bouzy ("Bouzy").  Goodman has not wavered from this claim.  If Judge Cott's conclusion is not a clear error, it can only otherwise be a deliberate false statement.  Either would be sufficient to provoke a legitimate objection.  Defendants' opposition brief conspicuously seeks to deny this substantial detail, strenuously arguing that Goodman has not made a valid objection despite the clear facts.  Each point in Defendants' filing is founded upon and reiterates their false assertion that Goodman has not identified any error and therefore need not be individually addressed.

Judge Cott's statement, *"The Court's construction of the amended complaint led it to characterize the allegations in that fashion"* defies credulity.  It should not be accepted at face value without further clarification as to what specific aspect of the amended complaint led the judge to such an erroneous conclusion.  The word "murder" does not appear in the amended complaint.  The specific allegation that concerns Wittes and the death of Smith is *"Defendant Bouzy defamed Goodman when he knowingly published false conclusory statements to third*

REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S OBJECTION TO ORDER AND REPORT AND RECOMMENDATION - 2

*parties on Twitter declaring Goodman had falsely accused Wittes of deliberately misleading the public with regard to the death of Peter W. Smith."* (*See* ECF No. 100 page 38 paragraph 67).

This case began as a result of Goodman's accusation that Wittes lied and hid true facts in order to present a false story about the death of Smith. This prompted the interaction with Bouzy and lead to the defamatory statements and deliberate destruction of Goodman's access to social media. Since then, each of the Defendants have filed pleadings replete with conclusory and false statements that rest on the legally meaningless and derogatory assertion that Goodman is a conspiracy theorist. A large amount of evidence is already on the record that proves Defendants were in fact engaged in a conspiracy and the Court should not ignore these facts in the way Judge Cott is attempting. On June 8, 2023, a hearing took place in the matter of Jankowicz v Goodman in Arlington Circuit Court. Defendant Nina Jankowicz ("Jankowicz") was cross examined in the matter and perjured herself repeatedly. Jankowicz' testimony was rife with contradictory and false statements which, once reviewed by the Court will prove self-evident. **(EXHIBIT A)**

These Defendants must not be permitted to lie their way out of this legal action. Each of Goodman's well-founded claims are backed by evidence that Defendants cannot refute. Instead, they choose to deny empirical facts and ignore reality in favor of their own fiction. If the Court intends to serve justice in this matter, these facts must be evaluated before Goodman's claims can be dismissed and certainly before the draconian injunctions recommended by Judge Cott and supported by Defendants' dishonest motion can be imposed. Judge Cott has recommended an outrageous and unjust infringement on Goodman's rights to report facts and evidence relevant to historical matters and of unquestionable public interest. He has further recommended denying Goodman's fundamental right to access the courts and these actions at least appear to be unjustly

REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S OBJECTION TO ORDER AND REPORT AND RECOMMENDATION - 3

calculated in favor of Defendants.  Basing any injunctive action of a false assessment of

Goodman's claims would be antithetical to the service of justice and must not be allowed.

## CONCLUSION

Goodman prays the Court will convene a hearing at which Defendants can answer

to this evidence with relevant countermanding facts and arguments stronger than juvenile insults

or derisive, fallacious claims of so-called conspiracy theory.  For the reasons stated herein, the

Court should deny Defendants' motion and sustain Goodman's objection to the entirety of Judge

Cott's outrageous and fundamentally flawed Order and Report and Recommendation.  Goodman

reiterates his request for relief by disqualification of Judge Cott for incompetence relative to

these facts or otherwise deliberate and unjust favoritism towards Defendants, and any other relief

as determined by the Court.



Signed this 19th day of June 2023

Respectfully submitted,

_____

Jason Goodman, Plaintiff, Pro Se
252 7th Avenue Apt 6s
New York, NY 10001
(323) 744-7594
truth@crowdsourcethetruth.org

REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S OBJECTION TO ORDER
AND REPORT AND RECOMMENDATION - 4

**(EXHIBIT A)**



1

V I R G I N I A :

   IN THE CIRCUIT COURT OF ARLINGTON COUNTY

- - - - - - - - - -x
         :
NINA JANKOWICZ,    :
         :
    Petitioner,  :
 -vs-       :
         :
         : CASE NO. CL23000953-00
JASON GOODMAN,    :
         :
    Respondent. :
         :
- - - - - - - - - -x

       Circuit Courtroom 11A
       Arlington County Courthouse
       Arlington, Virginia

       Thursday, June 8, 2023

     The above-entitled matter came on to be

heard before THE HONORABLE JUDITH L. WHEAT, JUDGE, in and

for the Circuit Court of Arlington County, in the

Courthouse, Arlington, Virginia, beginning at 10:23 a.m.

              CM23A041

2

```
1        APPEARANCES:

2
                On Behalf of the Petitioner:
3
                    Veronica Holmes, Esq.
4                   THE GELLER LAW GROUP, PLLC
                    4000 Legato Road
5                   Suite 1100
                    Fairfax, VA 22033
6

7               On Behalf of the Respondent:

8                   JASON GOODMAN, PRO SE

9
                        *  *  *  *  *
10
                    C O N T E N T S
11
```

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| NINA JANKOWICZ | 10 | 32 | - | - |
| JASON GOODMAN | 56 | 67 | - | - |
| DET. JOHN ADAMS | 79 | 83 | - | - |

```
16

17

18

19

20

21

22

23
```

Anita B. Glover & Associates, Ltd.
10521 West Drive
Fairfax, Virginia 22030
(703) 591-3004

3

1                           C O N T E N T S

2

3    EXHIBITS                              MARKED    RECEIVED

4    PETITIONER'S EXHIBIT NO. 1A, 1B        13        15

5    PETITIONER'S EXHIBIT NO. 2A, 2B        13        15

6    PETITIONER'S EXHIBIT NO. 3             16        27

7    PETITIONER'S EXHIBIT NO. 5             -         29

8    PETITIONER'S EXHIBIT NO. 6             -         29

9    PETITIONER'S EXHIBIT NO. 7             -         30

10   PETITIONER'S EXHIBIT NO. 8             13        31

11   PETITIONER'S EXHIBIT NO. 9             17        31

12   PETITIONER'S EXHIBIT NO. 10            23        24

13   PETITIONER'S EXHIBIT NO. 11            71        -

14

15

16

17

18

19

20

21

22

23

Anita B. Glover & Associates, Ltd.
10521 West Drive
Fairfax, Virginia 22030
(703) 591-3004

4

```
 1                    P R O C E E D I N G S
 2                (The Court Reporter was sworn by the Clerk
 3      of the Court.)
 4                THE COURT:  Good morning.  All right, so
 5      are we ready for trial this morning?
 6                MS. HOLMES:  Yes, Your Honor.
 7                MR. GOODMAN:  Yes, Your Honor.
 8                THE COURT:  All right.  Are there any
 9      preliminary matters that -- at this time, I think I'll
10      have you go ahead and introduce yourself.  Now that we're
11      back on the record, can I have everyone introduce
12      themselves for the record?
13                MS. HOLMES:  Good morning, Your Honor.
14      Veronica Holmes, counsel for Petitioner Nina Jankowicz.
15                THE COURT:  Okay.
16                MR. GOODMAN:  Jason Goodman, pro se, Your
17      Honor.
18                THE COURT:  All right.
19                MS. HOLMES:  And then Nina Jankowicz is
20      also here.
21                THE COURT:  All right.  Are there any
22      preliminary matters that we need to take up before we go
23      ahead and begin the trial?
```

5

1          MS. HOLMES:  Your Honor, I don't believe
2     there are any, just the request that Mr. Goodman, while
3     he is permitted to have his laptop in the courtroom, that
4     he does not live stream or record this hearing.
5          THE COURT:  Yes.  Mr. Goodman, the Court
6     does not allow hearings to be recorded or live streamed,
7     so please make sure -- I allowed you to have your
8     computer in so you could have access to any exhibits or
9     other evidence that you needed.
10          MR. GOODMAN:  Think you, Your Honor.  I
11     have read the order, and I have no intention of doing
12     anything like that.
13          THE COURT:  All right, well, I accept you
14     at your word for that.  All right --
15          MR. GOODMAN:  Your Honor --
16          THE COURT:  Yes, sir?
17          MR. GOODMAN:  With regard to preliminary
18     matters, if there is evidence that I want to show, will
19     that happen during the course of the trial, or should we
20     do that as a preliminary matter?
21          THE COURT:  So any evidence that you want
22     to present to the Court, you can present during the
23     course of the trial.  And the way that the trial will

6

1    proceed is I will allow each party to make an opening

2    statement, if you would like.  And it would be helpful

3    for me just to get at least a little sense of what you

4    both think this case is about, because I don't have very

5    much information.  And then, as it is Ms. Jankowicz's

6    motion, you can present whatever evidence that you would

7    like to present.

8              You would have the opportunity, sir, to

9    cross-examine any witnesses who are called, and then once

10   she rests, to the extent that you have testimony or

11   evidence that you want to present, you are certainly able

12   to do that, and obviously, if you testify, counsel would

13   be able to cross-examine you regarding your testimony.

14             Once all the testimony and evidence is

15   presented, then I will give each party, if they wish, the

16   opportunity to make a closing argument.  And at that

17   point, I may need to take a little bit of time just to

18   consider the evidence, and I'll come back and give you my

19   ruling.  All right?

20             MR. GOODMAN:  Thank you.

21             THE COURT:  All right, so, Counsel, why

22   don't you go ahead and start?

23             MS. HOLMES:  Good morning, Your Honor,

7

1    Veronica Holmes on behalf of Ms. Jankowicz.

2                    Ms. Jankowicz is here today seeking that

3    the protective order issued by the General District Court

4    on February 14th, 2023, is upheld for the full two-year

5    time period.

6                    Evidence will show that Ms. Jankowicz has

7    been repeatedly harassed and living under constant threat

8    of release of her personal information by Mr. Goodman for

9    almost a year now.  You would hear evidence that on

10   January 4, 2023, Mr. Goodman's Twitter account was locked

11   for violating Twitter's doxxing policy due to posting a

12   video containing Ms. Jankowicz's personal information.

13                   As a result, Mr. Goodman contacted Ms.

14   Jankowicz over six times over the course of two days and

15   filed a lawsuit against her requesting that the complaint

16   be removed.

17                   You will hear testimony that Mr. Goodman

18   believes Ms. Jankowicz is a criminal and should be

19   shunned from society.  You will hear testimony that he

20   has called her then unborn child demon spawn, and

21   suggested that she should have an abortion.  And for

22   these reasons, Ms. Jankowicz requests that the protective

23   order is upheld.

8

1          THE COURT:  All right.  Mr. Goodman, any

2    opening?

3          MR. GOODMAN:  Good morning, Your Honor.

4    Jason Goodman, pro se.  I am a journalist and documentary

5    filmmaker, and I had no knowledge of Ms. Jankowicz prior

6    to about April 25, 2022, when it was publicly announced

7    by the Department of Homeland Security that she would be

8    the director of a new Disinformation Governance Board,

9    and Ms. Jankowicz became a nationally recognized public

10   figure when she appeared on several news broadcasts

11   announcing the plan to determine which statements made by

12   American citizens, despite being lawful, Ms. Jankowicz

13   might find awful, and therefore deem disinformation.

14          Ms. Jankowicz has made a number of false

15   statements to the Arlington Police and to the Arlington

16   General District Court in order to obtain a preliminary

17   protective order against me, and she opportunistically

18   served me with a summons after making a false statement

19   to the Court, when she learned through civil litigation

20   that I would not be at my home in New York for an

21   extended period of time.

22          So I was served in absentia and almost

23   entirely missed the hearing.  I was blindsided in that

9

1   hearing, and I would like to present evidence today that

2   proves that Ms. Jankowicz has made deliberate false

3   statements with the intent of silencing me, denying me my

4   First Amendment rights, and denying me the ability to

5   investigate what I believe are illegal activities being

6   engaged in by the Department of Homeland Security and Ms.

7   Jankowicz, and I believe she is continuing those today.

8   Thank you, Your Honor.

9               THE COURT:  All right.  Counsel, who is

10  your first witness?

11              MS. HOLMES:  My first witness is Nina

12  Jankowicz, Your Honor.

13              THE COURT:  All right.  Ma'am, I'm going

14  to ask you to come up here to the witness stand.

15              MS. HOLMES:  And, Your Honor, I have a

16  number of Exhibits.  Is it okay --

17              THE COURT:  Just one second.  If you would

18  just stand and raise your right hand.

19              (The Witness was duly sworn by the Clerk

20  of the Court. )

21              THE COURT:  All right, go ahead, Counsel.

22  I'm sorry.

23              MS. HOLMES:  I just have a number of

10

1   exhibits.  Is it okay if I move out of the well to --

2               THE COURT:  Yes, you can approach the

3   witness and show them to her.

4               MS. HOLMES:  Thank you, Your Honor.

5   Whereupon

6                     NINA JANKOWICZ

7   the Petitioner, was called for examination by counsel on

8   behalf of the Petitioner, and having been duly sworn by

9   the Clerk of the Court, was examined and testified as

10  follows:

11                  DIRECT EXAMINATION

12      BY MS. HOLMES:

13      Q       Can you please state your full name and

14  zip code for the record?

15      A       My name is Nina Jankowicz, and I reside in

16  Arlington, 22204.

17      Q       How do you know the Respondent?

18      A       I had no knowledge of Mr. Goodman until he

19  contacted me in May of 2022.  As Mr. Goodman somewhat

20  incorrectly stated, and in fact, has lied already today,

21  I was appointed by the administration in March of 2022 to

22  lead the Disinformation Governance Board.

23              The Board was announced on April 27th.  It

11

1   met some backlash from many people in the United States,

2   and Mr. Goodman contacted me in May of 2022 in a phone

3   call that he recorded without my knowledge or consent.

4            I told him I was not giving interviews at

5   the time.  Again, another fraudulent statement he has

6   made this morning.  I didn't have any interview during

7   the time I was executive director, because I was

8   prohibited from doing so.

9            Mr. Goodman then released a phone call to

10  his followers online and proceeded to call me.  I asked

11  him to stop calling me, and in the time between May and

12  when I sought this protective order on January 5, 2023,

13  he referenced me in over 50 of his broadcasts and tweeted

14  me -- tweeted about me numerous times.

15           He also released my personal information

16  in videos -- in one video that is posted to Alex Jones'

17  Banned.Video platform on Infowars, in which Mr. Goodman

18  scrolls past an archived version of a website that

19  includes my home address, my in-laws' address, and as my

20  counsel has already stated, he has defamed and threatened

21  me.

22           He threatened my then unborn child.  He

23  has been curious to see my unborn child, and he has a

12

1   history of showing up at the addresses and places of work

2   of people that he is, quote, unquote, investigating.

3              I do not believe that Mr. Goodman's

4   activities have any journalistic purpose.  His purpose is

5   to threaten people and monetize that threatening of

6   people, and it should be said that I have been

7   threatened, defamed, harassed by tens of thousands of

8   people in the past year, and I only sought one protective

9   order.  And that is against Mr. Goodman.

10      Q       What incident caused you to initially seek

11  the protective order?

12      A       As I said, Mr. Goodman had been talking

13  about me on his channels for six months, and in January,

14  I decided to seek the protective order after Mr. Goodman

15  began calling me again with this allegation that I

16  somehow had some hand in shutting down his Twitter

17  account, when no such thing happened.

18              He, again, called me multiple times,

19  threatening frivolous legal action, and I decided to seek

20  a protective order after that.

21      Q       And what was the -- do you remember the

22  name of the video that he posted on that January 4th,

23  2023, post?

13

1      A      I believe this was the Disinfo Diva video,

2   which alleges that I am some sort of double agent in a

3   crazy conspiracy theory that I can't even follow.

4              MS. HOLMES:  Your Honor, I have marked the

5   video as Petitioner's Exhibit 8.  I'm not going to be

6   showing it today, because it is about two hours long, but

7   I do have a USB for the Court to enter into evidence.

8   But I'm marking it as Exhibit 8.

9              THE COURT:  Exhibit 8 or A?

10             MS. HOLMES:  Exhibit 8.

11             THE COURT:  8, okay.

12                              (The above-referenced

13                               document was marked

14                               Petitioner's Exhibit No. 8

15                               for identification.)

16         BY MS. HOLMES:

17         Q      And then you referenced a few emails that

18   you received from him the following day, so I have

19   Plaintiff's Exhibit 1A and 1B, and then 2A and 2B.

20                              (The above-referenced

21                               documents were marked

22                               Petitioner's Exhibit Nos.

23                               1A, 1B, 2A, 2B

14

1              respectively, for

2              identification.)

3              MR. GOODMAN:  Am I allowed to object?

4              THE COURT:  So she hasn't moved them into

5    evidence yet, so --

6              MR. GOODMAN:  Okay.

7              MS. HOLMES:  Your Honor, here is a copy

8    for you.

9         BY MS. HOLMES:

10        Q      Can you please identify what is in front

11   of you?

12        A      Yes, these are emails that Mr. Goodman

13   began sending me after he called me multiple times in

14   early January, again, threatening frivolous legal action,

15   alleging that I had some hand in removing his Twitter

16   account, and yeah.

17             MS. HOLMES:  Your Honor, this is 1A and

18   1B.

19             THE COURT:  All right.

20        BY MS. HOLMES:

21        Q      Is this a true and accurate representation

22   of the emails that you received?

23        A      Yes.

15

```
1              MS. HOLMES:  Your Honor, I would like to
2     admit Plaintiff's Exhibit 1A, 1B, 2A, and 2B into
3     evidence.
4              THE COURT:  Any objection, Mr. Goodman?
5              MR. GOODMAN:  2B and 2A?  I only have 1B
6     and 1A.  And I don't have the video.
7              MS. HOLMES:  I haven't admitted that into
8     evidence yet.
9              MR. GOODMAN:  No objections, Your Honor.
10             THE COURT:  All right, so Plaintiff's
11    Exhibit 1A, 1B, 2A, and 2B will be admitted without
12    objection.
13                         (Petitioner's Exhibit Nos.
14                          1A, 1B, 2A, and 2B were
15                          received in evidence.)
16    BY MS. HOLMES:
17       Q     Has Mr. Goodman released your personal
18    information in any other posts?
19       A     Yes, prior to the protective order hearing
20    that was held on February 14th, he waved a copy of the
21    preliminary protective order in front of the camera that
22    had my date of birth.
23             MS. HOLMES:  Your Honor, I've marked
```

16

1   Petitioner's Exhibit 3.

2                    (The above-referenced

3                    document was marked

4                    Petitioner's Exhibit No. 3

5                    for identification.)

6            THE COURT:  All right.

7       BY MS. HOLMES:

8            Q      Can you please identify Petitioner's

9   Exhibit 3?

10           A      Yes, this is a screenshot from Mr.

11  Goodman's YouTube video that he uploaded prior to the

12  February 14, 2023, hearing.  It's blurry in this video in

13  this screenshot, but you can absolutely make out my date

14  of birth when you are watching it in HD on YouTube, which

15  is what I did prior to coming to court on February 14.

16           Q      Have there been any threats made against

17  you or your child?

18           A      As we discussed earlier, Mr. Goodman has

19  said that he believes I committed treason and should be

20  put in jail.  He has said that my child should be put in

21  a separate jail.  He has said that I should get an

22  abortion, which I also consider a threat.

23                   He has, again, expressed skepticism that

17

1    my child even exists, because due to the threats to my

2    family, I have not posted pictures of my child online.

3    And this makes me worry that he might show up to live

4    stream images of my child, which again, he has a history

5    of doing.  He does this in the course of his live streams

6    fairly frequently.

7              And as a result of one of the videos that

8    he made, the phone call that he recorded and released

9    without my consent or knowledge, one of his followers

10   took that audio in December and made a video in which he

11   kind of used the audio as if he were having a

12   conversation with me, and said that I should be tried for

13   treason and hung until I am dead, and then made a

14   threatening motion with a noose.

15             So certainly the folks that follow Mr.

16   Goodman and watch the content that he creates are

17   violent.

18        Q        And was that conspiracist man's name Mike

19   Rockstone?

20        A        Yes.

21             MS. HOLMES:  Your Honor, I have a

22   demonstrative marked as Exhibit 9.

23                            (The above-referenced

18

1       document was marked

2       Petitioner's Exhibit No. 9

3       for identification.)

4           THE COURT:  All right.

5       BY MS. HOLMES:

6           Q       Do you have Petitioner's Exhibit 9 in

7    front of you?

8           A       I do.

9           Q       And is this a demonstrative containing

10   quotes and time stamps of various videos that Mr. Goodman

11   has posted and statements that he has made?

12          A       Yes, and I have also added the video that

13   is referenced in Exhibit 3.  He called me a dumb bitch.

14          Q       Okay.  Can you please refer to Exhibit 5,

15   Sunday with Charles, as the title of the video?

16          A       Yes.

17          Q       Can you please read 5A?

18          A       She's trying to destroy the Constitution.

19   I now have reason to believe that she had a role to play

20   in destroying my property, which is this YouTube channel

21   Crowdsource the Truth Five, and I'm going to continue

22   looking into what she thinks she's going to be able to do

23   relative to the Constitution.

19

1       Q     What is Crowdsource the Truth Five?

2       A     It is one of the many YouTube channels

3 that Mr. Goodman has.  He has had to make multiple of

4 them, because he has had multiple terms of service

5 violations that have caused YouTube to remove his

6 channels.

7       Q     Can you please read the quote of Exhibit

8 5B?

9       A     I'm convinced this woman has criminal

10 conflicts of interest, and they need to come out, and I

11 hope she gets prosecuted, and her and her baby in jail.

12 Well, the baby doesn't need to go to jail.  Put her in

13 jail before she has the baby.  That will be pleasant for

14 her.

15       And I should mention, Your Honor.  I

16 forget if I mentioned it before, that while all this was

17 initially going on in May, I was heavily pregnant.  I was

18 weeks away from giving birth to my first child.

19       Q     Please refer to Exhibit Number 6.  The

20 title is "Is Nina Jankowicz the Most Dangerous Woman in

21 America, with special guest Lee Stranahan."

22       Can you please read the quote of Exhibit

23 6A?

20

1      A      Doesn't baby need attention.  Why doesn't

2  she get an abortion.  They seem to want everyone else to

3  do that, get an abortion, do this job.

4      Q      Can you please refer to Exhibit 6B?

5      A      How do you get your name and information

6  redacted from public records and property sales

7  databases.

8      Q      Can you please read Exhibit 6C?

9      A      This alleged husband of hers is a virtual

10 Internet ghost.

11     Q      Can you please read Exhibit 6D?

12     A      She is 33.  Do people know that?

13     Q      Can you please read Exhibit 6E?

14     A      She needs to be shunned from society,

15 never hired for anything, and I'm sad to know that she is

16 reproducing more assholes in the world.

17     Q      Can you please read what is marked as

18 Exhibit 7, Charles Orwell is Closing In – Tweetbot

19 Monsters title?  Can you please read Exhibit 7A?

20     A      Where is the demon spawn.  It should pop

21 out soon.  I am disappointed when losers and criminals

22 procreate.

23     Q      Can you please read Exhibit 7B?

21

1          A          We've got to make sure she's not allowed

2     to hold any office in government, any position of

3     importance, and she should be held accountable for these

4     IC crimes.   The evidence that I have seen in the public

5     domain indicated that crimes are being committed.

6          Q          Do you believe that if the protective

7     order were removed, Mr. Goodman would leave you alone and

8     stop contacting you?

9          A          No, I do not.   He has made clear, again,

10    in the civil litigation that he has named me, and that he

11    will continue attempting to harass and, quote, unquote,

12    hold me to justice until he dies.   He said that in a

13    recent video.

14         Q          How has this impacted your immediate and

15    larger family?

16         A          So I would say first and most importantly,

17    during the first year of my son's life, we have been

18    denied peace of mind.   Obviously, I have been a target of

19    widespread nationwide harassment, but Mr. Goodman

20    repeatedly sharing videos on Alex Jones' website where

21    individuals who have, you know, persecuted and harassed

22    the families of Sandy Hook and regularly watch videos has

23    made us had to change our entire security posture in our

22

1   home.

2                And again, I worry that, you know, when I

3   take my son to daycare in the morning, or when we go out

4   for a walk that Mr. Goodman might be there live

5   streaming.  I worry that when I do speaking engagements

6   that he might show up and threaten me, and I worry the

7   same about his followers.

8                So I don't believe that if this protective

9   order were lifted that he would stop contacting me.  He

10   has made that clear.

11                My broader family, you know, he remarked

12   in Exhibit 9 that my husband is a virtual Internet ghost.

13   My husband has had to fully withdraw from public life

14   because of Mr. Goodman's behavior, because of his

15   investigations into me and my family.  My husband has no

16   role in my work.  I don't see why he should be

17   investigated by anyone who deems himself a, quote,

18   unquote, journalist, like Mr. Goodman.

19                Mr. Goodman has also shared the home

20   address of my in-laws in the video that is on Alex Jones'

21   Infowars platform.  And as a result, I would say that,

22   again, we have lost peace of mind.  We do not feel

23   secure, and I don't believe that anybody should have to

23

1   go through this simply for the act of having taken a job

2   in their area of expertise to serve their country.

3                    MS. HOLMES:  And regarding Mr. Goodman's

4   prior acts towards other people appearing at his home,

5   Your Honor, I have marked Petitioner's Exhibit 10.

6                                     (The above-referenced

7                                     document was marked

8                                     Petitioner's Exhibit No.

9                                     10 for identification.)

10                   THE COURT:  All right.

11          BY MS. HOLMES:

12          Q       Can you identify Exhibit 10?

13          A       Yes, this is a podcast transcript from --

14   a transcript of a podcast done by NBC News that looks at

15   how individuals, including Mr. Goodman, have

16   conspiracized about the health and well-being of the

17   nurse in Chattanooga, Tennessee, that received the COVID

18   shot and then fainted.

19                   People conspiracized that she died, and

20   Mr. Goodman went to Chattanooga, Tennessee, to stand in

21   front of the hospital where this woman worked, and

22   essentially harass her in much the same way that he has

23   been doing to me over the past year.

24

1          Q       And can you please read the highlighted
2     portions on page 10 -- I mean, 11 and 12?
3          A       Sure.
4                  THE COURT:  Counsel, are you moving this
5     into evidence?
6                  MS. HOLMES:  Yes, I will be, Your Honor.
7                  THE COURT:  Well, she can't read from it
8     until it's in evidence.  So are you moving it into
9     evidence?
10                 MS. HOLMES:  Yes, Your Honor.  I'd like to
11    admit Exhibit 10 into evidence.
12                 THE COURT:  Any objection, Mr. Goodman?
13                 MR. GOODMAN:  No.
14                 THE COURT:  All right, Plaintiff's Exhibit
15    10 will be admitted without objection.
16                                 (Petitioner's Exhibit No.
17                                  10 was received in
18                                  evidence.)
19                 THE WITNESS:  So page 11, people might
20    find this crazy, but I'm in Chattanooga, Tennessee, and
21    I'm standing in front of the CHI Memorial Hospital.  I
22    just -- I was here to follow up on a story people might
23    recall.

25

1          And then on page 12, I just followed some

2    directions, went to the information desk.  Security guy

3    basically told me to get the hell out of here.

4          BY MS. HOLMES:

5          Q       What has taken place following the

6    issuance of the protective order on February 14, 2023?

7          A       Mr. Goodman has not contacted me.  He has

8    not directly mentioned me on social media profiles,

9    although he has alluded to me on several occasions.  And

10   the harassment stopped.

11         Q       Has Mr. Goodman discussed the protective

12   order online following the issuance of it?

13         A       Only in allusions.  He has not directly

14   referenced it, but he has kind of referenced his right to

15   carry a firearm having been taken away, and his general

16   objection to the protective order.

17         Q       Do you believe that Mr. Goodman is a

18   danger to your family?

19         A       I don't believe that Mr. Goodman would

20   hurt me or my family directly, but I do believe he will

21   continue harassing me.  I do believe he will continue

22   sharing my personal information with his followers, who

23   as I've noted, have made direct threats to me and my

26

1    family.

2        Q       Are you seeking a continuance of the two-

3    year protective order?

4        A       Yes.

5        Q       Are you seeking that Mr. Goodman has no

6    contact with you directly, indirectly, through any third

7    party, or by any electronic means, including social

8    media, email, and texts?

9        A       Yes.

10       Q       Are you seeking that Mr. Goodman is

11   required to stay at least a hundred feet away from you at

12   all times?

13       A       Yes.

14       Q       Are you seeking that Mr. Goodman is

15   required to stay at least a hundred feet away from your

16   home at all times?

17       A       Yes.

18       Q       Are you seeking that Mr. Goodman is

19   required to stay at least a hundred feet from your work

20   place at all times?

21       A       Yes.

22       Q       Thank you.

23               MS. HOLMES:  Your Honor, I would like to

27

1    admit Exhibit Numbers 5, 6, 7, and 8 into evidence.  They

2    are all videos, and I have a USB for you.  And I also

3    have time stamps on the demonstrative exhibit just

4    introduced for demonstrative purposes in order to help on

5    the videos.

6                    THE COURT:  So you're not admitting

7    Exhibit 3?

8                    MS. HOLMES:  Yes, I believe -- yes, Your

9    Honor, I would like to request that Exhibit 3 is admitted

10   into evidence as well.

11                   THE COURT:  Do you have any objection, Mr.

12   Goodman, to Exhibit 3 being admitted, which was the

13   screenshot of the video?

14                   MR. GOODMAN:  I have no way of looking at

15   them or verifying --

16                   THE COURT:  Well, this is Exhibit 3.

17                   MR. GOODMAN:  Well, yes, that -- I thought

18   you were talking about the videos.

19                   THE COURT:  I haven't gotten to those yet.

20                   MR. GOODMAN:  Sorry, no objection.

21                   THE COURT:  All right.  So Exhibit 3 will

22   be admitted without objection.

23                               (Petitioner's Exhibit No. 3

28

```
 1                          was received in
 2                          evidence.)
 3              THE COURT:  Then I'm sorry, then you had a
 4    number of videos, Counsel.  So what are those?
 5              MS. HOLMES:  Exhibit Numbers 5, 6, 7, and
 6    8.
 7              THE COURT:  And what are those?
 8              MS. HOLMES:  These are videos that Mr.
 9    Goodman recorded and posted online on various websites.
10    They are currently on the IC now because they have been
11    taken down from YouTube and Twitter and places like that.
12              I have them downloaded and saved onto a
13    USB, but I can also play them for the Court if Mr.
14    Goodman would like to verify.
15              THE COURT:  Well, in order for him to know
16    whether he is objecting, I guess he needs to see them.
17    So how long are they?
18              MS. HOLMES:  They are very long, Your
19    Honor, but I can just play the bit with him talking in
20    the beginning for him to verify.
21              This is Exhibit 5, Your Honor.
22              (Video recording played.)
23              MS. HOLMES:  Any objection?  I'm sorry --
```

29

1               MR. GOODMAN:  No, that's fine.

2               THE COURT:  So what number is that?

3               MS. HOLMES:  That is Exhibit 5, Your

4      Honor.

5               THE COURT:  So there is no objection to

6      Exhibit 5?

7               MR. GOODMAN:  No, Your Honor.

8               THE COURT:  All right.  Then that will be

9      admitted without objection, for the record.

10                              (Petitioner's Exhibit No. 5

11                               was received in evidence.)

12               MS. HOLMES:  This is Exhibit 6, Your

13      Honor.

14               (Video recording was played.)

15               MS. HOLMES:  This is Exhibit 6, Your

16      Honor.

17               THE COURT:  Any objection?

18               MR. GOODMAN:  No, Your Honor.

19               THE COURT:  All right, Exhibit 6 will be

20      admitted without objection.

21                              (Petitioner's Exhibit No. 6

22                               was received in evidence.)

23               (Video recording played.)

30

1          MS. HOLMES:  This is Exhibit 7, Your
2    Honor.  There was a timestamp for the relevant portion
3    and quotes.
4          THE COURT:  Do you want to put that back
5    up so he can see it?
6          MS. HOLMES:  Do you want it with the exact
7    quotes for Exhibit 7?
8          MR. GOODMAN:  It's a video of me.  It's
9    fine, no objection.
10          THE COURT:  Okay, no objection to Number
11    7.
12                    (Petitioner's Exhibit No. 7
13                     was received in evidence.)
14          MS. HOLMES:  And this is Exhibit 8, Your
15    Honor.
16          (Video recording played.)
17          MR. GOODMAN:  Could you please advance to
18    55 minutes in this video?
19          MS. HOLMES:  No, I'm just showing it for
20    you to verify.
21          MR. GOODMAN:  Okay, yeah, let's put it in,
22    please.
23          THE COURT:  All right, so that will be

31

1    admitted without objection.

2                          (Petitioner's Exhibit No. 8

3                          was received in evidence.)

4              MS. HOLMES:  Thank you, Your Honor.

5              THE COURT:  And then were you also moving

6    Exhibit 9 as a demonstrative?

7              MS. HOLMES:  Yes, Your Honor.

8              THE COURT:  Any objection to Exhibit 9,

9    which was the excerpts?

10             MR. GOODMAN:  No objection, Your Honor.  I

11   have one question.  Can you please tell me the total run

12   time of this video?

13             MS. HOLMES:  This run time is an hour and

14   28 minutes, and 43 seconds.

15             MR. GOODMAN:  Thank you.

16             THE COURT:  All right.  So no objection to

17   Exhibit 9, which is the demonstrative.

18             MR. GOODMAN:  Correct.

19             THE COURT:  All right, that will be

20   admitted without objection.

21                          (Petitioner's Exhibit No. 9

22                          was received in evidence.)

23             THE COURT:  And then I already admitted

32

1    Number 10, which was the podcast.

2              All right.  Are you done with your

3    examination at this point?

4              MS. HOLMES:  Yes, Your Honor.

5              THE COURT:  All right, Mr. Goodman, do you

6    have any cross-examination of Ms. Jankowicz?

7              MR. GOODMAN:  Yes, Your Honor.

8              THE COURT:  All right.

9              MR. GOODMAN:  Okay, may I, Your Honor,

10   show the video that contains the phone call that was the

11   subject of all of this?  It's short.

12             THE COURT:  You can present your case

13   however you would like, sir.

14                    CROSS-EXAMINATION

15   BY MR. GOODMAN:

16        Q      Okay, Ms. Jankowicz, I would like you to

17   listen to this phone call.

18             Forgive me, Your Honor.  I just need a

19   moment to get to the right spot here.  Somehow the sound

20   is not coming through.

21             (Video recording played.)

22   BY MR. GOODMAN:

23        Q      Now, Ms. Jankowicz, this is the first time

33

```
 1   you and I had ever communicated, this phone call, is that
 2   correct?
 3          A       Yes.
 4                  MS. HOLMES:  Objection, Your Honor,
 5   relevance.
 6                  MR. GOODMAN:  She just told me that you
 7   had been experiencing --
 8                  THE COURT:  Hold on a second.  There is an
 9   objection.
10                  MR. GOODMAN:  Sorry.
11                  THE COURT:  It's overruled.  She indicated
12   in her prior testimony that this was the first contact.
13   Go ahead, and that it was taped without her knowledge.
14   Go ahead, Mr. Goodman.
15          BY MR. GOODMAN:
16          Q       Ms. Jankowicz, did you in a phone call
17   tell me that you had been experiencing harassment prior
18   to this phone call?
19          A       Yes, I did, and you continue that
20   harassment.
21          Q       But you had never heard of or met me prior
22   to this phone call, correct?
23          A       Mr. Goodman, I'm not testifying that you
```

34

1  are the source of all harassment.  I'm just saying --

2          Q       Please answer the question.

3                  THE COURT:  Well, okay, stop.  You are not

4  going to interrupt her answers.

5                  MR. GOODMAN:  I'm sorry.

6                  THE COURT:  If you don't think she has

7  answered your question, you can re-ask it, but we are not

8  going to interrupt each other.  So go ahead and finish

9  your answer, ma'am.

10                 THE WITNESS:  Mr. Goodman, I am not saying

11 you are the source of all the harassment.  I'm saying you

12 are the most pernicious and persistent harasser that I

13 have encountered.

14         BY MR. GOODMAN:

15         Q       Okay, I'm going to ask you to just answer

16 the questions, please, without editorial.

17                 That was the first phone call we ever had,

18 and you were being harassed prior to that phone call,

19 correct?

20         A       Yes.

21         Q       Had you seen any news reporting or any

22 Internet posts that I had done relative to you prior to

23 this phone call on or around May 14th?

35

1         A       No.

2         Q       Thank you.  I just want to point out, Ms.

3    Jankowicz, and to the Court --

4                 MS. HOLMES:  Objection, Your Honor.  It

5    needs to be a question.  This is cross.

6                 MR. GOODMAN:  There are three --

7                 THE COURT:  I'm going to let him ask his

8    question, and then depending on what the question is,

9    I'll take up your objection.

10                BY MR. GOODMAN:

11        Q       My question is this.  Are you aware of

12   David Sweigert?  Do you know who that is?

13        A       Only because of the lawsuit that you named

14   me in.  Otherwise, I would have no idea who he was, and I

15   have never communicated with him before.

16        Q       Are you aware of Tamara Wittes?

17        A       I have --

18                MS. HOLMES:  Objection, Your Honor,

19   relevance.

20                MR. GOODMAN:  It's relevant.

21                THE COURT:  What's the relevance, Mr.

22   Goodman?

23                MR. GOODMAN:  Tamara Wittes is the husband

36

1    of an individual who is in the civil lawsuit, who is

2    represented by the same attorney as Ms. Jankowicz.

3                 MS. HOLMES:  Again, relevance, Your Honor,

4    as to this protective order proceeding.

5                 MR. GOODMAN:  I have alleged that Ms.

6    Jankowicz is involved in crimes, and these people, I

7    allege, are involved with her.

8                 THE COURT:  But how is that relevant to

9    these proceedings, whether or not you have engaged in

10   behavior that is threatening to her?

11                MR. GOODMAN:  Well, let me come back to

12   that, because I am engaged in news reporting.  Ms.

13   Jankowicz says that I have --

14                MS. HOLMES:  Objection, Your Honor, it

15   needs to be question.  It's not Defendant's time to put

16   on his evidence.

17                BY MR. GOODMAN:

18        Q       Okay, please define harassment.

19        A       Harassment is repeatedly contacting,

20   annoying, threatening people with extraneous contact

21   after they've stopped -- asked you to stop contacting

22   them, which I did.

23        Q       I don't think those are all the elements

37

1    of harassment.  Can you define fraud?

2                    MS. HOLMES:  Objection, Your Honor,

3    relevance.

4                    THE COURT:  That is sustained, sir.  What

5    this -- what we are here on is whether or not there is

6    evidence that you have threatened, committed an act of

7    violence, force, or threat as defined in the Code, and

8    that is what this hearing is going to be limited to.

9                    MR. GOODMAN:  Thank you, Your Honor.

10              BY MR. GOODMAN:

11         Q      Ms. Jankowicz, did you file a police

12   report with the Arlington Police on January 5th?

13         A      Yes, I did.

14         Q      And did you tell the police that starting

15   in April, 2022, shortly after the announcement of the DHS

16   Disinformation Governance Board, of which I was the

17   Executive Director, Jason Goodman began making regular

18   video broadcasts about me and my role, defrauding me by

19   recording phone calls under false pretenses?

20         A      I used the word defraud to say that you

21   had made me believe you were a friend of Brandy

22   Zadrozny's, and recorded the phone call without my

23   consent.

38

1        Q     Can you tell please tell me what defraud

2  means?

3        A     I'm not here to have my vocabulary tested.

4        Q     Okay, but when you make a statement to the

5  police, if you use a word, and it is not true, that is a

6  false statement to the police.  What did I say that was

7  fraudulent in the phone call?

8        A     You recorded the phone call without my

9  consent and then released it to your followers.  You said

10  have you heard of me from Brandy.  I assumed you were a

11  friend of Brandy's.  That was getting at me using social

12  engineering at a very vulnerable time in my life.

13          And then you called me two subsequent

14  times after that, but you didn't play the phone call in

15  which I asked you to stop calling me.  Then you started

16  calling me in January again, which is why I sought this

17  protective order.

18        Q     Okay.  So are you aware that New York

19  State is a single-party consent state, and that it is

20  lawful to record a phone call without telling --

21          MS. HOLMES:  Objection, Your Honor,

22  relevance.

23          THE COURT:  I'll overrule the objection.

39

1    It's what she's aware of.

2                THE WITNESS:  I wasn't aware at the time,

3    because I'm not aware of all of the different statutes

4    regarding, you know, recording, but I still think what

5    you did was a very dirty and nasty thing meant to attract

6    harassment to me and my person and my family, as is

7    evidenced by the fact that you are appealing a protective

8    order today.

9                BY MR. GOODMAN:

10               Q       Well, that is your opinion.  So it's

11   possible, from what you're telling me, it seems like you

12   may have said things to the police, and you were

13   mistaken?

14               A       No, I don't --

15               MS. HOLMES:  Objection, Your Honor.

16               BY MR. GOODMAN:

17               Q       Well, you said you don't know the law in

18   New York.

19               THE COURT:  Sustained.  You can argue all

20   of that, Mr. Goodman.  You can go ahead and move on.

21               BY MR. GOODMAN:

22               Q       Okay.  So you said I defrauded you with

23   false pretenses.  What were the false pretenses?

40

1       A       I've already explained that you said have

2   you heard of me from Brandy.   I assumed you were a friend

3   of Brandy Zadrozny's.

4       Q       So it's your assumption?

5       A       Was that not your intention?

6       Q       My intention --

7               THE COURT:   Okay, folks, this is not going

8   to be a back and forth, okay?   So you need to ask a

9   question related to the protective order.   You need to

10  answer his question, but we're not going to just have a

11  back and forth all day.

12              BY MR. GOODMAN:

13      Q       Okay, you've submitted Exhibit 9, I

14  believe.   So this Exhibit from the video that was

15  published on February 14th, I heard you say earlier that

16  you can read your birth date on the video.

17                  Now, you may not know this, but printers

18  are much higher resolution than video.   Why did you

19  select the frame where the birth date is not visible?

20      A       I did not print this out, Mr. Goodman, but

21  if the Judge wishes to verify you can see my birth date,

22  she is welcome to do that.

23      Q       And you've told us you obtained this

41

1    before the Court hearing on February 14th.  Can you tell

2    us about that?  How did you obtain this and when exactly

3    did you obtain this?

4          A      Mr. Goodman, I'm a disinformation

5    researcher.  It may surprise you to know that I know how

6    to use the Internet.  But once you started harassing me,

7    I started keeping tabs on what you were saying about me.

8    And so before we went to court on February 14th, I went

9    to see if you were coming to court, and lo and behold,

10   you had posted this video, a scheduled video, to make it

11   seem like you weren't coming to court.

12               You had recorded it the day before, and I

13   saw that day that you had posted the video.  We grabbed

14   the screen shot.  We printed it out, and we came here.

15         Q      Ms. Jankowicz, how do you know what I

16   intend to do?

17         A      Because your intentions are very clear in

18   that you continued to harass me a year after you first

19   made contact with me.  Again, tens of thousands of people

20   have harassed me, defamed me, and threatened me.  You are

21   the only one against whom I sought a protective order.

22         Q      Have any of the other people who you

23   allege have harassed you sued you civilly?

42

1            MS. HOLMES:  Objection, Your Honor,

2    relevance, and outside the scope of direct.

3            THE COURT:  Sustained.  I don't know what

4    the relevance of that is.  Well, why don't you answer,

5    Mr. Goodman, what the relevance of that question is

6    before I rule on the objection?

7            MR. GOODMAN:  She has made several points

8    that there are so many people harassing her, but I am the

9    only one she's brought a protective order against, and I

10   allege she did that because she knew that I was going to

11   sue her, and that this was a strategy to prevent me from

12   sharing evidence about that lawsuit.

13           THE COURT:  Okay.  Well, that is all

14   argument, but I'll overrule the objection.  You can

15   answer whether any of the other people that you allege

16   have threatened or harassed you have filed civil suits

17   against you?

18           THE WITNESS:  No, they have not.

19        BY MR. GOODMAN:

20        Q       Have I ever threatened you?

21        A       Yes.  You said that I should be tried for

22   treason and put in jail.  You said that my baby should be

23   put in a separate jail.  You said that I should get an

43

1   abortion, and you said that -- you have repeatedly shared

2   my personal information about my in-laws and my husband.

3           So, yes, you have -- that is a threat to

4   me, Mr. Goodman, your sharing of my personal information.

5       Q       Ms. Jankowicz, do you believe that civil

6   and criminal procedures in court are threats from me?

7           MS. HOLMES:   Objection, Your Honor,

8   relevance, argumentative.

9           MR. GOODMAN:   You just said I was

10  threatening you with charging you with criminal charges.

11  And I'm --

12          THE WITNESS:   That is not what I said.

13          THE COURT:   Okay, whoa, stop.   I'm going

14  to overrule the objection.   She can identify what -- she

15  has identified what she believes were threats.   She can

16  answer that question.

17          THE WITNESS:   I'll repeat what I said.

18  You have said that I should be thrown in jail and tried

19  for treason.   You said that my baby should be thrown in a

20  separate jail.   You speculated whether my baby even

21  exists.   You have repeatedly shared my personal

22  information to a platform that is known for violent

23  harassment, Alex Jones' Infowars platform.

44

1              You have shared my in-laws' personal

2    information.  You have sought information about my

3    husband. Yes, that is a threat.

4         BY MR. GOODMAN:

5         Q      Now, you've said many times I've shared

6    your information on Alex Jones Infowars.  You are aware

7    that YouTube and Twitter are user content generated based

8    websites, right?  The stuff put there is made by

9    individuals like me, right?

10        A      Yes.  Yes, I am.

11        Q      Are you aware that Alex Jones Infowars is

12   not like that, that only employees of Infowars can put

13   things on there.  And I have no access to that.  Are you

14   aware of that?

15        A      No.  I am not aware of that.

16        Q      Okay, well, now you're aware of that, that

17   I have not posted to Infowars.

18             MS. HOLMES:  Objection, Your Honor, there

19   is no question before the Court.

20        BY MR. GOODMAN:

21        Q      Are you aware of Benjamin Wittes?

22             MS. HOLMES:  Objection, Your Honor,

23   relevance, and outside the scope of direct.

45

1          THE COURT:  What's the relevance, Mr.

2    Goodman?

3          MR. GOODMAN:  I'll move on to another

4    question.

5          BY MR. GOODMAN:

6          Q     Ms. Jankowicz, did you check off on this

7    petition for a preliminary protective order that the

8    Petitioner is or has been within a reasonable period of

9    time subjected to an act of violence, force, or threat?

10          A     Yes.

11          Q     And isn't it true that on February 14th,

12    in Court, you said to Judge Rucker that Jason Goodman did

13    not threaten you?

14          A     I believe I said I didn't believe that you

15    posed a violent threat to me, but you do pose a threat to

16    me, Mr. Goodman, as I have attested to today.

17          Q     Did you tell the judge on February 14th

18    that Jason Goodman did not threaten you, but someone who

19    had watched Jason Goodman's news report had threatened

20    you?  Did you or did you not say that?

21          A     I cannot recall exactly what I said, and

22    we didn't have a court reporter, so I'm not going to

23    answer that question.

46

1   Q  Did you know that there wouldn't be a

2 court reporter there that day?

3     MS. HOLMES:  Objection, Your Honor,

4 relevance and argumentative.

5     THE COURT:  I'll overrule the objection.

6 It just goes to what her knowledge was.

7     THE WITNESS:  I didn't know that day

8 whether there would be a court reporter or not.

9   BY MR. GOODMAN:

10   Q  Well, you're right.  There wasn't one, and

11 --

12     THE COURT:  Okay, Mr. Goodman, I am going

13 to ask you to limit it to questions right now.  You will

14 have an opportunity to argue.

15   BY MR. GOODMAN:

16   Q  Ms. Jankowicz, the evidence that you

17 presented relative to a previous news report that I had

18 done, where I went to CHI Memorial Hospital in

19 Chattanooga, do you believe that Tiffany Dover lives at

20 the hospital?

21     MS. HOLMES:  Objection, Your Honor,

22 relevance, and that's outside the scope.  That calls for

23 speculation.

47

1        BY MR. GOODMAN:

2        Q       You said I've been to people's homes, and

3   then you presented that evidence.  Do you believe she

4   lives at the hospital?

5                THE COURT:  Okay, I'm going to overrule

6   the objection.  You put the podcast into evidence.  I'll

7   let him probe a little bit.

8                THE WITNESS:  Perhaps I misspoke.

9   Clearly, that is her place of work.  I also sought a

10  protective order against, you know, my place of

11  employment, but I know from your previous broadcasts that

12  you try to show up at people's homes as well.

13       BY MR. GOODMAN:

14       Q       Please cite one of those people.

15       A       Well, you tried to look for the guy whose

16  website that you scrolled through, Alan Weberman.  The

17  website got removed.  That had my personal information on

18  it, as well as a bunch of anti-Semitic conspiracies.  And

19  you tried to show up at his home and found that the

20  address didn't exist.

21       Q       Do you know if it was a home or an office?

22       A       It was an address that was listed on the

23  website, and I assume it was a home.

48

1       Q       But we don't know, could have been an

2  office?

3       A       The point is, Mr. Goodman, that you show

4  up at addresses where you believe people to be so you can

5  harass them.

6       Q       Oh, so I can harass them.  Now, you're

7  aware that Nurse Tiffany Dover was one of the very first

8  people to receive the mRNA vaccine and passed out seconds

9  after receiving it on national television?  Are you aware

10 of that?

11      A       I wasn't aware until the recording, but

12 I'm not sure how that's relevant to this proceeding

13 today.

14      Q       Well, if I'm a news reporter, and

15 something of national interest occurs at the hospital,

16 CHI Memorial Hospital, and I go there to do a follow-up

17 report, is that harassment, or is that news reporting?

18               MS. HOLMES:  Objection, Your Honor,

19 argumentative.

20               THE COURT:  Sustained.  You can argue all

21 of that, counsel -- Mr. Goodman.  You can argue all of

22 those points, but this witness can give factual

23 testimony.

49

1          BY MR. GOODMAN:

2          Q      So I'm going to ask again for you to

3    provide me with an incident where I went to someone's

4    home to harass them.

5                 MS. HOLMES:   Objection, Your Honor, asked

6    and answered.

7                 MR. GOODMAN:   No, that was an office.

8                 THE COURT:   All right, she has indicated

9    there was an individual.   She assumed it was his home.

10                Do you have any other examples, ma'am --

11   no, no, counsel.   Do you have any other examples, ma'am?

12                THE WITNESS:   Do I?

13                THE COURT:   Yes.

14                THE WITNESS:   I'm aware that you went to

15   the office of the U. S. Attorney.   But to me, again, this

16   is not about whether you show up at someone's office or

17   home.   It is about you showing up, period.

18                And you have repeatedly shared my personal

19   address.   So I assume that you would show up at my home,

20   because that actually is where I work.   So --

21         BY MR. GOODMAN:

22         Q      And do you know how I obtained this so-

23   called personal information?   Did I get it from your

50

1    home?  Did I do something illegal?  Do you know?

2              MS. HOLMES:  Objection, Your Honor, calls

3    for speculation.

4              MR. GOODMAN:  No, I'm asking if you know.

5              THE COURT:  Overruled.  She can answer

6    whether she knows.

7              THE WITNESS:  I know that public records

8    exist, but it is against the terms of service of multiple

9    platforms to share personal information of individuals,

10   including our home addresses.  Just because home

11   addresses exist in property records doesn't mean that it

12   is good practice, and certainly not good journalistic

13   practice to share those records to your thousands of

14   followers online.

15             BY MR. GOODMAN:

16        Q         And what about if somebody makes some kind

17   of a filing, registering as a business, registering as a

18   foreign agent under FARA laws, if someone takes

19   information, their home address or whatever, and uses it

20   in a public filing like that, posts it on a public

21   website, is that personal information or public

22   information?

23             THE COURT:  Sustained.  The objection is

51

1   sustained.   We are getting far field of what this

2   protective order is about, Mr. Goodman.

3          BY MR. GOODMAN:

4          Q       The last question is going to be, Ms.

5   Jankowicz, do you think that the terms of service of

6   social media websites are the laws of the State of

7   Virginia, or are they different?

8          A       The terms of service are the terms of

9   service of the social media websites, and the social

10  media websites are the ones who carry out administering

11  them.

12         Q       Okay, so if a social media website

13  determines that information that an individual posts onto

14  a public database, like a government website, maybe it's

15  possible the social media company might say, well, this

16  is personal information, but the law might disagree.

17                 MS. HOLMES:   Objection, Your Honor, that

18  was --

19                 THE COURT:   Okay, I don't know what the

20  question is.   So hold on, finish your question, sir.

21         BY MR. GOODMAN:

22         Q       My question is did you make this report to

23  the police because you were concerned that I was going to

52

1   bring civil action against you?

2          A       I made the report to the police because

3   you continued to harass me more than seven months after I

4   resigned from government, six and a half, and I was tired

5   of being harassed.  That is why I made the report to the

6   police.

7                  I was worried about leaving my home every

8   morning with my dog, with my child, as you continued to

9   harass me, to defame me, to release my personal

10  information to your followers.  That is why I made the

11  report.  I was worried you would show up at an event or

12  at my home.

13         Q       And it was you who alerted the public you

14  were pregnant and posted a photograph of your child after

15  he was born, his head?  I remember you even posted a

16  picture.  Is that correct?

17         A       Yes, I did that, and because of

18  individuals like you, who continue to threaten my child,

19  I have not been able to share any updates about his life

20  in a way that normal people get to do.

21                 So, yes, it was pretty hard to conceal the

22  fact that I was nine months pregnant, Mr. Goodman.

23         Q       And did I have any influence on you?  Did

53

1    I tell you to take a job with the Department of Homeland

2    Security or go on television, or did you do that on your

3    own accord?

4                    MS. HOLMES:   Objection, Your Honor.

5                    THE COURT:   Sustained.

6           BY MR. GOODMAN:

7           Q        So this is one of your exhibits here.

8    This is the tweet that was published on January 4th,

9    right?  It says Disinfo Diva @ Wiczipedia.   That's your

10   Twitter account, isn't it, Wiczipedia?

11          A        Is that the question, is that my Twitter

12   account?

13          Q        Well, is this the tweet that was posted on

14   -- you know, you've entered into evidence, you set it in,

15   so this Tweet here, it says Disinfo Diva @ Wiczipedia.

16   So which of these links contain your private information?

17          A        I don't know, Jason, because I never made

18   the report that you allege that I made.

19          Q        But you don't know who made this report?

20          A        I do not.

21          Q        So who can make reports to Twitter on

22   behalf of your Twitter account other than you?

23          A        Anyone can make a report on Twitter,

54

1    Jason.  I don't know if you know how Twitter works, but

2    you can click the three dots in the upper right-hand

3    corner and report somebody for sharing someone's personal

4    information, for sharing violence, for anything.  Anyone

5    can make a report like that.

6            Q       But you --

7            A       And at the time, I will also note that

8    Elon Musk was really cracking down on doxxing.  So you

9    can talk to your buddy, Elon, about that.

10           Q       I've never met Mr. Musk, but you've just

11   told us that you monitor my social media activity, didn't

12   you?

13           A       Yeah, but I don't know what time --

14           Q       Not this one?

15           A       -- it posted.

16           Q       Oh, you --

17                   MS. HOLMES:  Objection, asked answered,

18   Your Honor.

19                   THE COURT:  Okay, I think we've --

20                   MR. GOODMAN:  Yeah, I think I'm done.

21   Thank you, Your Honor.

22                   MS. HOLMES:  No redirect, Your Honor.

23                   THE COURT:  May the witness step down?

55

1    Thank you, ma'am.

2                        (Witness steps down.)

3                        THE COURT:  Do you have any other

4    evidence, Counsel?

5                        MS. HOLMES:  No, Your Honor.

6                        THE COURT:  All right.

7                        MS. HOLMES:  We do reserve a request for

8    attorney's fees.

9                        THE COURT:  What is the basis for an

10   attorney's fees request?

11                       MS. HOLMES:  Your Honor, the Petitioner

12   maintains that this is a frivolous appeal for a valid

13   protective order, and as she's had to spend fees in order

14   to prepare and properly defend that the protective order

15   should stay in place, she requests that the attorney's

16   fees are awarded.

17                       THE COURT:  Is there any statutory basis

18   for attorney's fees?

19                       MS. HOLMES:  I don't have it right now,

20   Your Honor, but I can hand that up to the Court.

21                       THE COURT:  All right, well, we can take

22   that up at the end.

23                       Mr. Goodman, do you have evidence that you

56

1    want to present to the Court?

2                    MR. GOODMAN:  Yes, Your Honor.

3                    THE COURT:  All right.  Are you going to

4    testify?

5                    MR. GOODMAN:  Yeah.

6                    THE COURT:  All right, I'll just need you

7    to stand and raise your right hand, and the Clerk will

8    swear you.

9                    (The Defendant was duly sworn by the Clerk

10   of the Court.)

11                   THE COURT:  All right, do you want to

12   testify from there, so you can use your --

13                   MR. GOODMAN:  Yes, Your Honor.

14   Whereupon

15                         JASON GOODMAN

16   the Respondent, having been duly sworn by the Clerk of

17   the Court, testified on his own behalf as follows:

18                   MR. GOODMAN:  So the first thing, Your

19   Honor, that I would like to clear up, there are three

20   relevant videos in this matter.  The first video is on

21   the screen right now, and this is a video that I live

22   streamed to my YouTube channel, Crowdsource the Truth

23   Five, on May 16, 2022.  And I don't know if you can see,

57

1    but this comes from my broadcasting system --

2                    THE COURT:  I don't have it on here.  Is

3    it on --

4                    MR. GOODMAN:  It's on this.

5                    THE COURT:  Is there a way you can -- hang

6    on a second.  Got it, all right, very good.

7                    MR. GOODMAN:  So we can see this video is

8    titled 2022-5-16.  That indicates that it was recorded on

9    May 16th, and then you see 20:00.  That is a 24-hour

10   clock.  The video began at 8 PM Eastern time.

11                   And this video is -- forgive me, I've lost

12   the mouse -- this video is one hour and 27 minutes in

13   duration, and you can see that because it was finalized

14   at 9:27 PM.

15                   Now, this video was live streamed after I

16   conducted quite a bit of investigation into Ms.

17   Jankowicz.  I'm very concerned about the time Ms.

18   Jankowicz spent as a Clinton Fulbright Scholar in Ukraine

19   in February and March of 2014.

20                   MS. HOLMES:  Your Honor --

21                   MR. GOODMAN:  She's a public figure --

22                   THE COURT:  Hang on a second.  What is

23   your objection, Counsel?

58

1              MS. HOLMES:  This is not relevant to the

2     proceeding today.

3              MR. GOODMAN:  I'm explaining my research.

4              MS. HOLMES:  Again, not relevant to the

5     proceeding, Your Honor.

6              MR. GOODMAN:  It's relevant to this video.

7              MS. HOLMES:  It's about the protective

8     order sought by Ms. Jankowicz, not about Mr. Goodman's

9     conspiracy theories.

10              MR. GOODMAN:  It's relevant to the video.

11              THE COURT:  Okay, everyone needs to speak

12     one at a time, okay?  So she can finish her objection,

13     and then you can respond, but we are not going to keep

14     interrupting.

15              Why is his -- this is all about what you

16     have asserted is threatening behavior.  Why is his intent

17     not relevant to whether or not the Court can ascertain

18     that that behavior is threatening as set forth in the

19     Code?

20              MS. HOLMES:  Yes, Your Honor.  The

21     research and background and baseless information that he

22     compiled against Ms. Jankowicz is not relevant.  What is

23     relevant is the persistent fact of him posting repeated

59

1    information, including her personal information.

2                    THE COURT:   The objection is overruled.

3    Go ahead.

4                    MR. GOODMAN:   I was very concerned about

5    Ms. Jankowicz's time in Ukraine in February and March of

6    2014, and I began looking into her and her relationship

7    with Tamara Wittes, who is currently, I believe, the

8    Deputy -- well, let's put a pin in that for now.

9                    The point is this video was broadcast May

10   16th, and it is an hour and 27 minutes in length, and at

11   approximately 55 minutes, I start looking into this

12   archived website.  Now, I'm utilizing a public website

13   called Archive.org.  I have no access to Ms. Jankowicz's

14   personal information.

15                   I only deal in public domain information.

16   And I was looking at this website that I had found in the

17   due course of conducting normal investigation on the

18   public Internet.

19                   I've never tempted to breach Ms.

20   Jankowicz's computer or do anything illegal.  This is

21   just information I found on the Internet.

22                   Now, immediately after posting this video

23   to Crowdsource the Truth Five, Crowdsource the Truth Five

60

1    was completely eliminated from YouTube.  And
2    additionally, I earn money through a credit card
3    processing website called Patreon.
4                    MS. HOLMES:  Objection, Your Honor,
5    relevance.
6                    MR. GOODMAN:  I'm explaining myself.  I
7    received a --
8                    THE COURT:  So what is the relevance of --
9                    MR. GOODMAN:  The relevance is I also
10   received a message from Patreon concurrent with the
11   removal of the video from YouTube.  And Patreon said to
12   me, hey, we've been alerted that there's personal
13   information in this video.
14                   So what I did, Your Honor, is I created a
15   new version of the video, because I disagreed with the
16   assessment that I had published personal information, but
17   I didn't want to lose my ability to process credit cards,
18   so I created this version of the video, which you can see
19   is one hour and 23 minutes in length, and I've removed --
20   if we go to the 55 minute mark, I've removed the segment
21   that contained the information that Ms. Jankowicz
22   objected to.
23                   Additionally, I went to the trouble of

61

1   tiling out the address on this public filing with the

2   Virginia Secretary of State, a public website.  So as a

3   courtesy to Ms. Jankowicz, and to protect her personal

4   information, when I was made aware that she objected to

5   it being shown, I eliminated it.

6            This is the only version of the video that

7   is published on any websites that I control.  Now, the

8   third version of video is this.  This video came from an

9   Alex Jones website called Banned.Video.  I have an image

10  of that website here.

11           Okay, so, we're not on the Internet right

12  now, but this is a screen capture of the Alex Jones

13  website from earlier this morning.  You can see that it

14  was posted there May 18th, and I have no ability to post

15  things on this website.

16           I do not work for Alex Jones.  I don't

17  have Alex Jones' phone number.  I have spoken to him.  I

18  have appeared on his show.  I've also been on Tucker

19  Carlson.  I've been on a lot of national news shows.

20  Some people think I'm a very good reporter.

21           Anyway, this video from Alex Jones, I

22  presume they downloaded from my YouTube channel the day

23  it was published, because it got a lot of attention.

62

1    Now, you can see that this video is an hour and 29

2    minutes in length, because after they downloaded my video

3    -- and by the way, this video, Alex Jones got it right

4    from YouTube before I had removed the segment at the 55

5    minute mark.

6              And so that still contains the

7    objectionable material that Ms. Jankowicz doesn't like.

8    But what the people at Infowars did, they took my video,

9    and then they added their advertising at the end.  I had

10   nothing to do with this.  I don't control Alex Jones, and

11   he does whatever he wants.

12             So with regards to Ms. Jankowicz's

13   assessment that these videos have been removed from other

14   channels, there is an individual who is involved in the

15   civil action that I brought against Ms. Jankowicz by the

16   name of David George Sweigert --

17             MS. HOLMES:  Objection, Your Honor,

18   relevance.

19             MR. GOODMAN:  -- who is relevant to this

20   matter, because I believe he has been making complaints

21   on behalf of Ms. Jankowicz.  And --

22             THE COURT:  Okay, well, again, I need you

23   to testify to facts and not things that may be proven in

63

1    something else or based on beliefs.  So --

2                MR. GOODMAN:  Let me share my intention --

3                THE COURT:  -- I need you to focus on the

4    subject of this, which is whether or not you engaged in

5    conduct that was threatening as that is defined in the

6    Virginia Code for purposes of the protective order.

7                MR. GOODMAN:  Okay.  So this video that

8    the image was presented on February 14th, of me showing

9    the protective order --

10               THE COURT:  We're now discussing Exhibit

11   3?

12               MR. GOODMAN:  Exhibit 3.  Just to clarify

13   by intent in publishing this, it was to distract David

14   George Sweigert, because he stalks and harasses me daily.

15   And I allege he was involved in getting this material to

16   Ms. Jankowicz, because it arrived in court virtually

17   concurrent with its broadcast.

18               She is correct.  I timed it to play while

19   we were in court.  This evidence was not in here hand

20   when she walked in the door.

21               MS. HOLMES:  Objection, Your Honor.

22   That's speculation.

23               MR. GOODMAN:  Well, I know when I

64

1  programmed it to go, and I know what time the hearing

2  began.  And I know what my intent was.

3            THE COURT:  Well, he is testifying based

4  on what he believes the facts to be, and ultimately, I'll

5  have to make a factual determination.  Overruled.

6            MR. GOODMAN:  So that was my intent, was

7  to ferret out exactly what David George Sweigert has to

8  do with this, and I did not know that Ms. Jankowicz's

9  birth date was on this document.

10           I've reviewed the video subsequent to that

11  February 14th hearing, and I could not make out the birth

12  date.  If there's a fame in there that shows it, I'd like

13  to see it.

14           Also, Ms. Jankowicz has testified earlier

15  today that I have stated that I intend to harass her.

16  That is not true.  My statement was that I intend to

17  bring her to justice, because I have seen a lot of

18  evidence that causes me to believe she is involved in a

19  very serious array of crimes, and that her activities in

20  Ukraine in 2014 are related.

21           That is the nature of my research.  I am a

22  serious journalist and documentary filmmaker, and all of

23  the evidence that I have presented is factual.  I have

65

1    never threatened Ms. Jankowicz.  I have no control over

2    what the people who watch my news broadcasts do.

3                And the other thing that I wanted to bring

4    to your attention, Your Honor, so the police report was

5    made on January 5th, and it contains a number of false

6    statements.  What happened subsequent to this police

7    report is I submitted to -- forgive me, I should have

8    brought this as an exhibit.

9                In the civil case Ms. Jankowicz is now

10   named in, as discussed in some of these emails that she

11   has provided as evidence, I had to alert the Court that I

12   needed an extension of time because my mother was having

13   spinal surgery, and I was going to be out of town for

14   several days or weeks.  That was on January 9th, the same

15   day that Ms. Jankowicz filed this petition in which she

16   falsely told the Court that it was me, the Respondent,

17   who had within a reasonable period of time subjected her

18   to an act of violence, force, or threat.

19               MS. HOLMES:  Objection, Your Honor,

20   relevance.

21               MR. GOODMAN:  The relevance is she made

22   this false --

23               THE COURT:  Okay, I'm going to overrule

66

1    the objection, but I'm going to ask you again, Mr.

2    Goodman, to just testify as to facts.

3              So what I ultimately have to do -- you can

4    argue whatever you all want, but this is your testimony,

5    and so you need to limit it to that.  So go ahead, sir.

6              MR. GOODMAN:  Very good, Your Honor.  On

7    January 9th, I filed a document with the US District

8    Court for the Southern District of New York, alerting the

9    Judge and David George Sweigert, and other litigants in

10   the case, that at that time did not yet include Ms.

11   Jankowicz, but she was aware of the litigation, because I

12   had sent her several emails letting her know that she

13   would be added to the litigation if she did not withdraw

14   the complaint from Twitter.

15             She did not tell me at that time by email

16   or through her attorney that she hadn't made the

17   complaint to Twitter.  She did not threaten me with a

18   cease and desist or a defamation lawsuit.  She simply

19   went to this building and -- or somehow filed this

20   preliminary protective order in which she alleged that I

21   had subjected her to an act of violence, force, or

22   threat.

23             She didn't tell them that I defrauded her.

67

1    She could have had her lawyer send me a letter to remove

2    whatever statements she felt were defamatory or libelous

3    or any of the other inaccurate terms that she has applied

4    to my news reporting.

5              But the time proximity of the filing of

6    this preliminary protective order directly matched the

7    time that I had alerted the US District Court in the

8    Southern District of New York that I would be caring for

9    my mother during and after her spinal surgery, something

10   that this individual, David George Sweigert, did a lot of

11   activity around.  I allege this is related.

12             What the net result was, there was a

13   summons taped to my door that I didn't know about until,

14   I believe it was February 12th when I returned home, and

15   I had to quite quickly reverse myself and drive right

16   back down south here to Virginia to attend this hearing,

17   where Ms. Jankowicz received this protective order.

18             I believe that's all I have to say right

19   now.

20             THE COURT:  All right, cross-examination,

21   Counsel?

22             MS. HOLMES:  Yes, Your Honor.

23             CROSS-EXAMINATION

68

1          BY MS. HOLMES:

2          Q        In the Disinfo Diva video that you shared,

3     removing the personal information, when did you edit

4     that?

5          A        I believe it was May 18th.  I've got it

6     right here, so I'll check.

7          Q        So the hearing on the 14th, the video was

8     still posted containing the personal information?

9          A        False.

10         Q        And then there is an original video

11    containing the personal information still available as

12    recently as July 1, 2022?

13         A        Say that again.

14         Q        There is a video, the original video that

15    you made containing the personal information, is still

16    available, and it was available as recently as July 1,

17    2022?

18         A        No website that I control is hosting the

19    video with the objectionable material.  Immediately upon

20    being notified that it was objectionable to Ms.

21    Jankowicz, and that notification came in the form of

22    removal from YouTube and the removal from Patreon, to

23    restore the Patreon account, I made the edit.

69

1          That was the 17th or 18th of May.  It was

2     back up.  No channel that I control had the objectionable

3     video after May 18, 2022.

4          Q     So the clip that you shared on Twitter on

5     January 4th, 2023, that was a violation, that contained

6     the personal information?

7          A     It was not a violation, and it did not

8     contain personal information.

9               MS. HOLMES:  Your Honor, I'd like to

10    direct you to Petitioner's Exhibit Number 8, with the

11    video that was posted, Disinfo Diva, Dangerous Double

12    Agent, Who is Nina Jankowicz.  That is the video that was

13    posted, shared the link on the Twitter video containing

14    the personal information.

15              MR. GOODMAN:  No, object.  I object, Your

16    Honor.

17              THE COURT:  Well, you disagree that that's

18    what that Exhibit 8 is, is that correct?  Because it's

19    already in evidence.  So is your testimony in response to

20    her question that you do not agree that that's what that

21    Exhibit 8 is?

22              MR. GOODMAN:  I do not agree that Exhibit

23    8 contains the original video with the objectionable

1    material.  It links to the edited video and whoever made

2    that complaint neglected to verify the content of the

3    video.

4         I hope it's becoming clear that it is

5    confusing.  It's got the same name, but it's four minutes

6    shorter, and the objectionable material has been removed.

7    I think what happened was it just appeared, and it looked

8    like the same video, and Ms. Jankowicz, or whoever made

9    this complaint, assumed it was the same video.

10        This is why I sent the email saying you've

11   made a false statement.  Withdraw the false statement,

12   restore the Twitter account, and I'll leave you alone.

13   There was no response to that litigation warning email

14   whatsoever.  That resulted in me bringing the lawsuit.

15   It was not a frivolous lawsuit.  It is not a fraudulent

16   lawsuit.  It --

17        MS. HOLMES:  Your Honor, there is no

18   question before the Respondent.

19        MR. GOODMAN:  -- could have been

20   completely avoided if I had just been responded to.

21        THE COURT:  All right.  So that is his

22   response to your claim that Exhibit 8, which contains the

23   personal information, was still up as of July of 2022.

71

1   Go ahead and ask your next question, Counsel.

2               MS. HOLMES:  And it was also still up as

3   far as January 4, 2023.

4               BY MS. HOLMES:

5       Q       Did you send an email to David George

6   Sweigert cc'ing a variety of people, including Ms.

7   Jankowicz, on May 10, 2023, stating I will see David

8   George Sweigert and any of his co-conspirators sent to

9   prison if it takes the rest of my life to accomplish

10  that?

11      A       It sounds like an email that I would have

12  sent to David George Sweigert, because he's been

13  persistently harassing me for the past six years doing

14  all these types of things.  Yeah, I sent that email.

15              MS. HOLMES:  Your Honor, I'd like to mark

16  this as Petitioner's Exhibit 10.

17              THE COURT:  All right, you already have a

18  10, so this would be 11.

19                              (The above-referenced

20                              document was marked

21                              Petitioner's Exhibit No.

22                              11 for identification.)

23              BY MS. HOLMES:

72

1       Q     It's already in your testimony that you've

2   included Ms. Jankowicz in the lawsuit because you

3   consider her a co-conspirator of Mr. Sweigert?

4       A     I included her in that lawsuit because she

5   refused to withdraw the complaint to Twitter.  As I have

6   warned her in the litigation, she could have avoided all

7   this by saying I didn't make the complaint.

8       Q     Isn't it true that you believe Ms.

9   Jankowicz is a foreign agent?

10      A     Yes, because the evidence that I found

11  caused me to believe that.  She resigned from her

12  position two days after I publicly published it, and then

13  six months later, she registered under FARA.  Now, she is

14  a registered foreign agent, isn't she?

15      Q     Isn't it true that you believe that she

16  should be in jail?

17      A     I believe she should receive due process

18  and have a trial, and I'd like to testify at that trial.

19  And I think the evidence I have will put her in jail,

20  yes.

21      Q     Isn't it true that you believe Ms.

22  Jankowicz should be shunned from society?

23      A     Yes.

73

1      Q     Isn't it true that you stated that you

2  don't think criminals should procreate?

3      A     Well, that's my opinion.

4      Q     Isn't it true that you have stated doesn't

5  the baby need attention, why doesn't she get an abortion,

6  they seem to want everybody else to do that, get abortion

7  an abortion to do this job?

8      A     Those comments were made in the context of

9  --

10      Q     Please answer the question.

11      A     I am answering the question.  Those

12  comments were made in the context of an environment where

13  there was a large heavily politically left movement in

14  the country advocating for abortion, and my

15  extemporaneous question that I was sort of asking my

16  audience in the course of the live stream was, if

17  politically left wing individuals are so enthusiastic

18  about abortion, and if Ms. Jankowicz is politically left

19  and wanting to have this very important demanding job,

20  why not just do what the left encourages and get an

21  abortion.

22      I wasn't threatening to give her an

23  abortion.  I was simply asking a rhetorical question that

74

1   was meant to be critical of what I see as a hypocritical

2   political point of view.

3        Q       Isn't it true that you called Ms.

4   Jankowicz's child demon spawn?

5        A       That was an insult, a statement of

6   opinion.

7        Q       And that's a statement that you made?

8        A       It may be.  I would have to review the

9   video.

10       Q       Isn't it true that you have contacted Ms.

11  Jankowicz over 60 times in the past year?

12       A       I don't believe that's true.  Contacted

13  her 60 times?  I don't think that's true.  I phoned her a

14  few times.  I phoned her once to invite her to an

15  interview, which we heard earlier, she declined.

16               Two days later, she was fired or resigned.

17  Something happened.  She was no longer in that position.

18  So then I called her again to ask her now that she was no

19  longer working there if she could give me an interview.

20  And then she told me not to contact her again, which I

21  honored, until I perceived that she had done something to

22  me, which was to make this fraudulent complaint against

23  my Twitter account.

75

1           And in that case, my contact to her was

2    not harassment, because it didn't exist without a

3    purpose.  The purpose in contacting her was to let her

4    know that in my perception, she had made a fraudulent

5    statement, and if she didn't remove it, she would be

6    sued.

7           MS. HOLMES:  Your Honor, can you please

8    instruct the Respondent to answer the question?

9           THE COURT:  No, you've asked a question.

10   He can answer it.  You can obviously make your questions

11   more directed, but at this point, I'm going to let him

12   answer the question, just as I let your client answer the

13   questions.

14           MS. HOLMES:  Okay.

15       BY MS. HOLMES:

16       Q      Isn't it true that you recorded at least

17   12 videos discussing Ms. Jankowicz?

18       A      I'd have to review the videos.  I don't

19   know the actual number, but she was a public figure who

20   had announced her intention to violate the First

21   Amendment of the U.S. Constitution, and I found this

22   reprehensible and criminal.  So I think I could have made

23   a hundred videos about that, and you really wouldn't be

76

1   able to say anything about it.

2        Q       Isn't it true that you've repeatedly

3   released and reposted videos containing Ms. Jankowicz's

4   personal information?

5        A       Can you say that again, please?

6        Q       Isn't it true that you've repeatedly

7   released and reposted videos containing Ms. Jankowicz's

8   personal information?

9        A       I'm not sure if that is true.  Repeatedly

10  released and reposted, I don't think that's true.

11       Q       Isn't it true that you reposted the video

12  on February 14th containing Ms. Jankowicz's personal

13  information in the temporary protective order?

14       A       Posted it in a temporary -- could you

15  clarify that, please?

16       Q       Isn't it true that you released Ms.

17  Jankowicz's personal information contained within her

18  protective order on February 14th, 2023?

19       A       I don't understand the question.  On

20  containing in a protective order?  What?

21       Q       Isn't it true that you released Ms.

22  Jankowicz's personal information that was within the

23  temporary protective order in a video posted on February

77

1    14th, 2021?

2         A       Okay, you're talking about the birth date.

3    I don't believe that's true.  First of all, I didn't

4    realize -- I did not realize that birth date was on the

5    document at the time that I recorded the video.

6              After it came out at the hearing on

7    February 14th, I went back and reviewed the video, and

8    I'm not able to see the birth date there, and I have the

9    original recording.  We see the evidence that you've

10   presented.  It's totally not legible.  I don't understand

11   why you would submit an evidentiary document --

12             THE COURT:  Okay, Mr. Goodman, I am going

13   to ask you to stop arguing with everybody, okay?  You

14   will have argument at the end of the case, but you need

15   to answer the questions.

16             THE WITNESS:  I disagree.  I do not

17   believe that her personal information was posted in this

18   video, and the video has not been removed from YouTube,

19   because I don't think there's evidence that I posted her

20   personal information.

21             The video is still there, as far as I

22   recall.  I do not believe that has been removed, and the

23   channel wasn't disrupted.  So that video is still there.

78

1          MS. HOLMES:  Your Honor, Court's
2     indulgence.
3          BY MS. HOLMES:
4          Q     Have you ever shared the link to the
5     Infowars posting of the Disinfo Diva video?
6          A     Ever?  I don't recall.  I don't know.
7     Probably -- I mean, I'm mostly trying to drive traffic to
8     my sites, so I don't know if I have.  I don't think I
9     would.  Maybe I have.  I don't know.  Do you have any
10    evidence of me doing that?
11         MS. HOLMES:  Thank you, Your Honor.  That
12    concludes the cross.
13         THE COURT:  All right.  Do you have any
14    rebuttal or redirect that you want to do of yourself, Mr.
15    Goodman, after your cross-examination?  Is there anything
16    else that you want to present at this time?
17         MR. GOODMAN:  I think that's -- no, Your
18    Honor.  I think --
19         THE COURT:  All right, any rebuttal
20    evidence, Counsel?
21         MS. HOLMES:  No, Your Honor.
22         THE COURT:  All right.  So then both
23    parties rest?  All right, I'm going to go ahead and take

79

1   just a five-minute restroom break, and then I'll come

2   back and hear both parties' closing arguments, all right?

3               MR. GOODMAN:  I'm sorry, I have one

4   witness.  I'm sorry.

5               THE COURT:  Oh, you have a witness that

6   you want to call?

7               MR. GOODMAN:  Yes.

8               THE COURT:  All right.

9               MR. GOODMAN:  Detective John Adams with

10  the Arlington Police.

11              DETECTIVE ADAMS:  Good morning, Your

12  Honor.

13              THE COURT:  Good morning.  Would you

14  please swear that Detective?

15              (The Witness was duly sworn by the Clerk

16  of the Court.)

17  Whereupon

18              DETECTIVE JOHN ADAMS

19  a Witness, was called for examination by the Respondent,

20  and having been duly sworn by the Court, was examined and

21  testified as follows:

22              DIRECT EXAMINATION

23      BY MR. GOODMAN:

80

1      Q     Good morning, Detective.

2      A     Good morning, sir.

3      Q     You are familiar with a police report

4 filed by Ms. Jankowicz on January 5th, correct?

5      A     Yes, sir, I am.

6      Q     So at the bottom of this police report,

7 there is a parenthetical note, I guess, that references

8 Detective Adams, number 1315.  That's you, correct?

9      A     Yes, that is my badge number.  Yes, sir.

10     Q     And the note says I spoke with the

11 reporting party, and they advised me that the individual

12 did not specifically make a death threat towards them.

13 It was supposedly one of his online followers.  The

14 reporting party was just -- the incident -- just wants

15 the incident documented for right now.

16     A     Yes, sir, that's true.

17     Q     And that's your note that you wrote?

18     A     Yes, correct, sir.

19     Q     Can you tell me a little bit about how a

20 report like this gets created?

21     A     Yes, sir, I can.  So I'm a detective in

22 the systems management division of the Arlington County

23 Police Department in which I oversee all the online

81

1    reporting system in which a citizen can file a police

2    report through the online portal.

3                    My particular job, as a detective, I

4    review all the online reports that come through.   I

5    perform follow-up, which means I'll contact the reporting

6    party or the victim, or sometimes even the suspect or a

7    witness.   I'll either approve a report or reject the

8    report.   And in most cases for harassments, I actually

9    investigate the harassments in the reports that come

10   through online.

11        Q      So was this considered a harassment

12   report?

13        A      Well, the way Ms. Jankowicz filed it as a

14   harassment report, it came through as a harassment

15   report, yes, sir.

16        Q      And did you follow up with an

17   investigation?

18        A      I did not.   And the reason for that, sir,

19   is because when I spoke to Ms. Jankowicz on the phone,

20   she just wanted the incident documented.

21                   When the victim of a reporting party tells

22   me that, I don't do any investigation whatsoever.

23        Q      And so it's normal for you to follow up

82

1    and have a note like this at the bottom of a report?

2         A       Yes, and I can elaborate as to why I

3    specifically asked her --

4         Q       Please.

5         A       Okay.  So when those harassments come in

6    like that, the reason why I specifically ask the

7    reporting party or the victim if there was any type of

8    physical or death threats made towards them is because

9    that's actually a separate charge, and it's placed in

10   writing in the State of Virginia.

11              It's a felonious charge.  It's a -- if

12   that were the case, then that type of incident cannot be

13   filed online, so therefore, I would actually have to

14   write out the report.

15              So I specifically have to ask the

16   reporting party or victim that particular question, so

17   that's why I asked Ms. Jankowicz that.

18        Q       And so there's been no further

19   investigation, and did you make any kind of determination

20   if the claims that Ms. Jankowicz was making satisfied the

21   elements of the crime of harassment in Virginia?

22              MS. HOLMES:  Objection, Your Honor, asked

23   and answered.  The witness already said he did not do any

83

1    investigation.

2              MR. GOODMAN:  But that doesn't speak to

3    whether or not the elements of the crime were met.

4              THE COURT:  Okay, well, that would call

5    for a legal conclusion.  And so that objection will be

6    sustained.

7              MR. GOODMAN:  No further questions, Your

8    Honor.  Thank you.

9              THE COURT:  Any cross-examination,

10   Counsel?

11             MS. HOLMES:  Yes, Your Honor.

12                  CROSS-EXAMINATION

13       BY MS. HOLMES:

14       Q      In your conversation with Ms. Jankowicz,

15   what did she tell you?

16       A      I can only recollect certain things,

17   because it was so long ago.  That was January.

18   Basically, what I asked her, she pretty much reiterated

19   what she had written in the report there.  And then I

20   asked some follow-up questions, as Mr. Goodman had

21   already -- at the bottom, what I wrote as far as what she

22   wanted to be done, and if any death threats were made

23   towards her by Mr. Goodman.

84

1     Q      And what did you advise her regarding the

2  nature of the posts and nature of the harassment with the

3  tweets?

4     A      Advised her as far as --

5     Q      As far as being able to continue or

6  proceed with this police report?

7     A      I'll be honest, I do not remember.  I do

8  not remember if I gave her advice about a protective

9  order.  Usually, I do that to reporting parties that want

10 to file harassment charges that do not want to do

11 anything as far as criminal.  So I explain to them the

12 process of attempting to acquire a preliminary protective

13 order.

14            I cannot remember if I provided that

15 advice to Ms. Jankowicz or not.

16     Q      Okay, thank you.  That's all the questions

17 I have.

18            THE COURT:  Any redirect, Mr. Goodman?

19            MR. GOODMAN:  No, Your Honor.

20            THE COURT:  All right, may this officer be

21 excused?

22            MR. GOODMAN:  Thank you.

23            THE COURT:  All right, thank you very

85

1    much.  You're excused.

2                    (Witness steps down.)

3                    THE COURT:  All right, so my question was

4    unclear earlier.  Mr. Goodman, do you have any other

5    evidence of any kind that you want to present at this

6    time?

7                    MR. GOODMAN:  That's all, your Honor.

8    Thank you.

9                    THE COURT:  All right, based on that

10   additional evidence, Counsel, do you have any rebuttal

11   that you want to present?

12                   MS. HOLMES:  No, Your Honor.

13                   THE COURT:  All right.  Then at this

14   point, I'll go ahead and take a 10-minute break, let

15   everyone go to the restroom, and then I'll come back and

16   hear closing arguments.

17                   (Brief Recess.)

18                   THE COURT:  All right, go ahead, Counsel.

19   I'll hear your closing argument.

20                   MS. HOLMES:  Thank you, Your Honor.  She

21   needs to be shunned from society, never hired for

22   anything.  I'm sad to know that she is reproducing more

23   assholes in the world.  We've got to make sure she's not

86

1    allowed to hold any office in government, any position of

2    importance, and she should be accountable for these IC

3    crimes.

4              Under Virginia Code section 19.22-152.7.1,

5    an act of violence, force, or threat means any act

6    involving violence, force, or threat that results in

7    bodily injury or places one in reasonable apprehension of

8    death, sexual assault, or bodily injury.  And such act

9    includes but is not limited to stalking.

10             Mr. Goodman has repeatedly called,

11   emailed, and released Ms. Jankowicz's personal

12   information, placing her in fear of threat, and he has

13   repeatedly harassed her through phone calls, emails,

14   social media posts, which would constitute stalking.

15             Mr. Goodman claims to be a journalist, but

16   his actions are far past the investigation, and they

17   demonstrate a fixation on Ms. Goodman -- on Ms.

18   Jankowicz.

19             You have heard the evidence today that Mr.

20   Goodman has repeatedly emailed and called Ms. Jankowicz

21   and has harassed her due to her position in government.

22   When she stepped down on May 18th of 2022, his posts have

23   continued up until January 4, when he emailed her, called

87

1    her repeatedly up to six times in the two days following

2    his posts being taken down by Twitter, asking her to have

3    it removed.

4              This is no longer -- Ms. Jankowicz is no

5    longer serving in a public office or in a governmental

6    capacity, and Mr. Goodman's harassment has continued.

7    Prior to the protective order being issued on February

8    14, Mr. Goodman continued to email and call Ms.

9    Jankowicz.  He continued to file -- he filed litigation.

10             He emailed her as well through that, and

11   he has been communicating with her, harassing her

12   regarding the post, regarding her personal information

13   being released, up until, and including, the day of the

14   protective order hearing, when he released her personal

15   information through the temporary protective order an

16   hour before the hearing started.

17             He released it at 1 PM, and the hearing

18   started at 2 PM that day.  Mr. Goodman has said I will

19   see David George Sweigert and any of this co-conspirators

20   sent to prison if it takes the rest of my life to

21   accomplish that.  Mr. Goodman, apart from any court or

22   police intervention will not stop contacting, will not

23   stop harassing, will not stop investigating Ms. Jankowicz

88

1   for things that he has created in his mind that he thinks

2   that she has violated.

3              Ms. Jankowicz requests the protective

4   order is upheld due to this harassment, due to this

5   stalking, and this has caused a threat of violence

6   towards her as her information has been released.  Her

7   birth date has repeatedly been released.  The videos are

8   still posted online --

9              THE COURT:  Well, hang on.  Talk me

10  through the repeatedly released.  So my understanding of

11  -- and I guess if you could go to your Exhibit 9 and walk

12  me through.  These are the excerpts from the video.

13             So when is the first time that you say

14  that her personal information was released?  Was it in

15  the May 18, 2022, video, or was it in something before

16  that?

17             MS. HOLMES:  Her personal information was

18  released in the Disinfo Diva -- where is that -- her

19  personal information was released in the Exhibit 8,

20  Disinfo Diva or Dangerous Double Agent, Who is Nina

21  Jankowicz.

22             THE COURT:  All right, so that was the May

23  18, 2022, video, is that correct?

89

1           MS. HOLMES:  Yes, that was the original

2    post that Mr. Goodman posted.

3           THE COURT:  All right.

4           MS. HOLMES:  He then shared that widely,

5    and it was picked up by other websites that are

6    considered widely conspiracy theory websites.

7           THE COURT:  Okay, well, the evidence I

8    heard is it was picked up on the Alex Jones website.  Was

9    there any other evidence presented of other websites that

10   that was picked up on?

11          MS. HOLMES:  Yes, on the Banned Video

12   website.  It's Banned-Video.com.

13          MR. GOODMAN:  Objection, Your Honor.

14          THE COURT:  All right, well, you can argue

15   the evidence didn't say that, but this is part --

16          MR. GOODMAN:  But that's the same website.

17          THE COURT:  Well, as I say, it's argument.

18   You can make whatever argument you want.  This is her

19   argument.

20          All right, go ahead, ma'am.

21          MS. HOLMES:  And that's where it's

22   currently still available.  It was repeatedly available

23   and shared on YouTube and other sites that have all been

90

1    taken down because of the personal information that it

2    contained.

3              Then Mr. Goodman also posted her date of

4    birth through the temporary protective order that was

5    released on YouTube on February 14th, the day of the

6    protective order hearing.

7              He has also conducted numerous

8    investigations into Ms. Jankowicz's husband.  He has not

9    been able to find any information, because that was all

10   taken down due to his harassment and repeated

11   investigation into Ms. Jankowicz.

12             He has also looked for personal

13   information regarding her child that she has not posted

14   online due to his harassment and continuing, what he

15   considers investigation.

16             THE COURT:  So what evidence was presented

17   with respect to what actions he took regarding her child

18   and when he did that?  I'd like to hear what you believe

19   the evidence is on that.

20             MS. HOLMES:  Yes, those would be the video

21   exhibits, Exhibit Number 6, Exhibit Number 7.  In Exhibit

22   Number 6, he states this alleged husband of hers has --

23   is a virtual Internet ghost.  Surrounding that quote, he

91

1    was discussing how he could not find any information

2    about her husband, because he repeatedly had been

3    looking.

4            He also -- and then regarding the child,

5    he just has repeatedly, in video Exhibit Number 5, video

6    Exhibit Number 6, video Exhibit Number 7, discussed her

7    child in very derogatory and specific ways, and also

8    suggests that she should have an abortion.

9            THE COURT:  All right.

10           MS. HOLMES:  In closing --

11           THE COURT:  So, I'm sorry, just again,

12   because I know you have them, what were the dates -- so

13   Exhibit 5 was one video.  What was the date of that

14   video?

15           MS. HOLMES:  Your Honor, let me -- Court's

16   indulgence.  I have the website.

17           THE COURT:  Do you have the date of the

18   video on the video itself?

19           MS. HOLMES:  Your Honor, I believe there

20   is a date.  It might be the date that I downloaded and

21   saved them to the USB drive, but it might not be the date

22   they were posted.

23           So I'm going to find the links.  And I can

92

1   also present that to the Court, the video links to access

2   them.  But --

3               THE COURT:  Well, that was all put into

4   evidence, and I didn't allow Mr. Goodman to access the

5   Internet.  So if you don't have the video itself, the

6   dates, I guess I'll just go from there.

7               MS. HOLMES:  Okay.  But, yes, those were

8   all posted prior to the protective order being in place,

9   and they are all still readily available online.

10              Does Your Honor have any more questions?

11              THE COURT:  No, go ahead.

12              MS. HOLMES:  Okay.  In closing, Your

13  Honor, Ms. Jankowicz requests the protective order stay

14  in place.  Post February 14th, the harassment has

15  stopped.  Mr. Goodman has stopped contacting Ms.

16  Jankowicz.  He has stopped calling her.  He has stopped

17  posting related to her specifically.  He has alluded, but

18  he has not posted directly, which is what she is

19  requesting.

20              She is requesting that the stalking stop.

21  She is requesting that the threats against her and her

22  family and the alleged threats that are being released

23  online stop.  Thank Your Honor.

1          THE COURT:  All right, Mr. Goodman.

2          MR. GOODMAN:  Your Honor, in her role as

3   the Executive Director of the Disinformation Governance

4   Board, Ms. Jankowicz announced that she would be deciding

5   what First Amendment protected speech from American

6   citizens would be determined lawful but awful.  We never

7   got to hear the process by which Ms. Jankowicz would

8   determine the falsity of any particular information that

9   would allow her to define it as disinformation, and from

10  what she said, it seems like anything she disapproves of

11  is disinformation, and we have seen that here today.

12          She doesn't like the information that I

13  have found and shared about her, so she deems it to be

14  harassment and defamatory, although it does not meet the

15  elements of any of these torts or criminal charges.

16          THE COURT:  Okay, well, I don't want to

17  talk about what you said about her.  I want to talk about

18  what you said about her child.  I want to talk about what

19  you said about her husband, because you might have a

20  right to say whatever you think you want to say about

21  her, but I want to understand why you think you have any

22  right to have made any of the statements about her child

23  or her husband, and why that's not, what you did, a

94

1    violation of the Code of Virginia.

2            MR. GOODMAN:  Well, first of all, most of

3    the things that they've alleged that I have said are

4    distortions of what was actually said.  Secondarily, I

5    had no knowledge that Ms. Jankowicz was expecting a child

6    or had a child until she publicized that information.

7    This is the way I've learned everything about Ms.

8    Jankowicz.

9            She said that I was searching for

10   information about her husband.  That's false.  The only

11   time I looked for information about her husband was in

12   that first video, and you will notice that I said he is a

13   virtual ghost, because he had removed all that

14   information before I got involved with this.

15           The fact of the matter is, Ms. Jankowicz

16   went on national television announcing her role as this

17   person who is going to decimate the First Amendment of

18   the Constitution, and it wasn't just me.  Most people

19   bristled at this.  That is in part why the Disinformation

20   Governance Board was dissolved.

21           However, the time proximity with which

22   that happened relative to me exposing facts that caused

23   me to believe that Ms. Jankowicz should be registered

95

1   under 22USC611, Foreign Agent Registration Act, when I

2   published that information --

3                    THE COURT:  Okay, sir, again, I asked you

4   --

5                    MR. GOODMAN:  Because I was investigating

6   --

7                    THE COURT:  -- to talk about the

8   statements with respect to her child and her husband.  I

9   don't need to get into your whole investigation --

10                   MR. GOODMAN:  I never incited any

11  violence.  All I said was I doubted the existence of the

12  husband because I couldn't see any evidence that she was

13  married.  And what I did see was evidence that Ms.

14  Jankowicz was in Ukraine in February and March of 2014,

15  when a violent coup occurred, and people were killed.

16                   And what I didn't share with you today is

17  evidence of a --

18                   THE COURT:  Well, then it's not in front

19  of me today.  I don't want to hear it, sir.

20                   MR. GOODMAN:  I saw evidence in the public

21  domain that caused me to believe that Ms. Jankowicz was

22  involved in very serious crimes.  And we have a war going

23  on in Ukraine right now.  And when I started to look into

96

1  this evidence, rather than getting sued for defamation or

2  warned to remove these statements, or I would be sued for

3  defamation, Ms. Jankowicz proceeded to make false

4  statements to the Court, false statements to the police.

5          She previously said I -- the judge got

6  very angry in the last session because Ms. Jankowicz said

7  that I had said that her baby should go to baby jail, and

8  when asked if I had said that, I said I don't recall

9  saying that, and I don't think baby jail is a real thing,

10  and I don't think that is something I would have said.

11          So the point is I never told anyone to

12  take any action whatsoever against Ms. Jankowicz.  This

13  name of the person who she said threatened her, that's

14  the first time I've ever heard that name.  I don't know

15  that person.  I don't interact with that person.  I can't

16  be held responsible for people do and say when they see

17  news reports that I put out.

18          And to the extent that I say her child is

19  a demon spawn or whatever that is that they claim that I

20  said, I think the people who are involved in efforts that

21  result in wars that kill hundreds of thousands of people

22  and threaten this country should be in jail.  And I think

23  that I am allowed to criticize them within the context of

97

1    the First Amendment.

2         I don't want anyone to harm Ms. Jankowicz.

3    I want her to be brought up on criminal charges, and

4    that's what I've said.  To the extent that I have doubted

5    the existence of the husband or the child, I didn't tell

6    her to post things on the Internet telling people that

7    she was pregnant or having a child.  I didn't tell her to

8    post a picture of her child's head.  She is provoking

9    this curiosity about herself and her family.

10        And I didn't tell her to violate the First

11   Amendment of the Constitution.  Banned.Video is Alex

12   Jones.  I can't control what Alex Jones does, and I

13   believe they saw the video and thought it was informative

14   and important.  It certainly -- I mean, Ms. Jankowicz

15   today is registered under FARA, and if you read the FARA

16   statute, it says the purpose of asking foreign agents to

17   register is specifically so that citizens of the United

18   States can monitor the activities of foreign agents in

19   the United States.

20        Ms. Jankowicz is a registered foreign

21   agent.  She left the employ of the United States

22   Government immediately after I identified that she should

23   be a registered foreign agent, and I alleged that she has

98

1 made these false statements here to the Court and to the

2 police to stifle my First Amendment rights and to prevent

3 me from reporting to the public facts and information

4 that are unfavorable to Ms. Jankowicz.  And that is why

5 she wants a protective order preventing me from speaking

6 about her on social media.

7      Thank you, Your Honor.

8      THE COURT:  Thank you, sir.  Anything

9 else, Counsel?

10     MS. HOLMES:  Your Honor, I just want to

11 reiterate that Ms. Jankowicz requests that the protective

12 order is upheld due to Mr. Goodman's continued and

13 repeated harassment of her and investigation that he has

14 said even in his closing that he will not stop.  He

15 believes that this is his right.

16     Ms. Jankowicz is not attempting to violate

17 his Constitutional right to post online.  She asked that

18 he does not post her name or her husband's or her

19 child's.  She's asking for protection limited to her

20 person, and she is no longer in a position of political

21 importance where she is considered a public figure.

22 Thank you.

23     THE COURT:  All right, well, during the

99

1    break, the Court had the opportunity to take a look at

2    Virginia Code 19.2-152.7:1, which defines for purpose of

3    protective orders act of violence, force, or threat, and

4    that Code section says it means any act involving

5    violence, force, or threat that results in bodily injury

6    or places one in reasonable apprehension of death, sexual

7    assault, or bodily injury.

8            Such act includes but is not limited to

9    any forcible detention, stalking, criminal sexual assault

10   in violation of chapter four, or any criminal offense

11   that results in bodily injury or places one in reasonable

12   apprehension of death, sexual assault,  or bodily injury.

13           So that is the definition of what is

14   considered conduct under the protective order statute.

15   Virginia Code 18.2-60.3 defines stalking, and it defines

16   stalking as any person, with certain exceptions, which I

17   do not believe Mr. Goodman falls into, who on more than

18   one occasion engages in conduct directed at another

19   person with the intent to place, or when he knows or

20   reasonably should know that the contact places that other

21   person in reasonable fear of death, criminal sexual

22   assault, or bodily injury to that other person, or to

23   that other person's family or household members.

100

1          The Court has heard evidence that was
2   admitted without objection, including what is set forth
3   in the demonstrative Exhibit Number 9, that in one video,
4   Mr. Goodman stated I'm convinced this woman has criminal
5   conflicts of interest, and they need to come out, and I
6   hope she gets prosecuted, and her and her baby in jail.
7   Then he says, well, the baby doesn't have to go to jail.
8   Put her in jail before she has the baby.  That will be
9   pleasant for her.
10          On another occasion, he has a video that
11  says doesn't the baby need attention.  Why doesn't she
12  get an abortion.  And then on another occasion -- oh,
13  then in that same video, he says she needs to be shunned
14  from society, and I'm sad to know that she's reproducing
15  more assholes in the world.
16          And then in a different video says where
17  is the demon spawn, relating to the baby.  It should pop
18  out soon.  I'm disappointed when losers and criminals
19  procreate.
20          Mr. Goodman stated that he was aware that
21  he put out a video that had personal information of Ms.
22  Jankowicz in the video, and that while he took actions to
23  take that down, that that video is still listed on the

1   Internet with her personal information in it, and in

2   addition, it has been represented that the videos that

3   have been admitted into evidence and to which these

4   quotes were taken, are all still on the Internet and are

5   all still accessible.

6            While Ms. Jankowicz may at the time have

7   been a public figure, her unborn child, Mr. Goodman,

8   certainly was not, and neither is her child since it has

9   been born.  And when you went after the child publicly

10  and incited people to take action against the child,

11  which the Court finds that these quotes do by calling the

12  child a demon, by saying it should be aborted, by saying

13  it should be in jail, and then when you say yourself you

14  have no control over what the people who read your

15  content do, that clearly falls into a category where Ms.

16  Jankowicz could reasonably be in fear that her child and

17  her family were in danger from the comments that you

18  posted.

19            And perhaps that wasn't your intent.

20  Perhaps you thought you were just making perfectly

21  appropriate comments, but you crossed the line, the First

22  Amendment line when you did that.  And the Court finds

23  absolutely the evidence is sufficient to find that she

**Anita B. Glover & Associates, Ltd.**
**10521 West Drive**
**Fairfax, Virginia 22030**
**(703) 591-3004**

102

1    was in reasonable fear of harm to her child and to her

2    family with respect to 18.2-60.3.

3                 And since stalking is a basis for a threat

4    of violence under a protective order as a basis for a

5    protective order, the Court finds that she has met her

6    burden for a protective order, and will go ahead and

7    grant the protective order, and order that you need to

8    stay away from her.  You need to stay away from her

9    family.

10                You are not to have any contact with them

11   directly or indirectly.  And you are not to post anything

12   on social media about them.

13                And I certainly understand your First

14   Amendment rights, and you have a right to say what you

15   want within the confines of that, but I think you clearly

16   crossed the line when you made these particular comments

17   and put them out and left them out there when your own

18   testimony is that you have no control over what your

19   supporters might do based on what they read.

20                And I think that given all of the

21   testimony, and given Ms. Jankowicz's testimony that she

22   is in fear, and that, in fact, she is afraid to go out in

23   public with her child, she's afraid to go out and walk

103

1   her dog because of what you have put out there, the

2   standard has been met.  So I'm going to go ahead and

3   enter a permanent protective order in the case.  And you

4   can certainly note your appeal.  All right.

5                   MR. GOODMAN:  Am I to say something, or --

6                   THE COURT:  That is my ruling.  So I will

7   go ahead and -- I think there's a document that I need to

8   fill out.  I don't know if the Clerk fills it out, and

9   then the Deputy will need to serve that, but that is the

10  Court's ruling in the case.

11                  You can fight it out in court all you

12  want.

13                  MR. GOODMAN:  I will.

14                  THE COURT:  You have all kinds of rights

15  to fight it out in court with respect to what your

16  beliefs are and what the evidence is.  But I think in

17  terms of the way that this has been handled, it violates

18  that law.

19                  MR. GOODMAN:  False statements to the

20  police don't violate the law?

21                  THE COURT:  I've made my ruling, sir.

22                  MR. GOODMAN:  Thank you, Your Honor.

23                  THE COURT:  I'm going to go ahead and fill

104

1    that out.  I'll come back and bring it so the Deputy can

2    serve it.  All right.  So if everyone would just stay for

3    a moment.

4                        * * * * * *

5                    (Whereupon, at approximately 12:35 p.m.,

6    the hearing in the above-entitled matter was concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

105

CERTIFICATE OF REPORTER

I, COLLEEN M. VANCE, a Certified Verbatim
Reporter, do hereby certify that the foregoing
proceedings were taken by me and thereafter reduced to
typewritten form, that the foregoing are true and correct
to the best of my knowledge and ability; and that I have
no interest in said proceedings, financial or otherwise,
nor through relationship with any of the parties in
interest or their counsel.

_____

Colleen M. Vance, CVR-CM-M
Certified Verbatim Reporter